# IN THE SUPREME COURT OF IOWA

No. 06–0877

Filed October 30, 2009

**JOSEPH SPREITZER**,

Appellee,

vs.

**HAWKEYE STATE BANK,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Johnson County, Amanda P. Potterfield, Judge.

Further review of a decision by the court of appeals reversing district court judgment on a jury verdict for a claim of fraudulent misrepresentation and affirming the decision of the district court to refuse to submit punitive damages. **DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED AND CASE REMANDED FOR NEW TRIAL.**

Patrick M. Roby and Robert M. Hogg of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellant.

Kevin J. Caster, Mark L. Zaiger, and Sarah Jane Gayer of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellee.

**CADY, Justice.**

In this appeal and cross-appeal, we consider whether there was sufficient evidence to support a jury verdict for fraudulent misrepresentation and whether a claim for punitive damages should have been submitted to the jury. In doing so, we primarily examine the justifiable-reliance element of the tort and the requirement that the misrepresentation cause the damage claimed. The district court entered judgment for fraud based on a jury verdict, but refused to submit a claim for punitive damages. The court of appeals held there was insufficient evidence to support the verdict for fraud. Upon our review, we vacate the decision of the court of appeals. We conclude there was insufficient evidence to support the amount of compensatory damages and that punitive damages should have been submitted to the jury. We reverse the judgment of the district court and remand for a new trial on the issue of compensatory and punitive damages.

## I. Background Facts and Proceedings.

Joseph Spreitzer is a successful businessman from Cedar Rapids. He has a degree in mechanical engineering and owns several businesses, including a family business that sells heavy equipment used in mining, quarrying, and road building. During his career, he has invested in several business enterprises.

In 1998, Spreitzer learned through a business partner that a company called RJ Manufacturing was looking for investors. RJ was located in Lisbon, Iowa, and manufactured agricultural sprayers. The company had been in operation since 1993 and needed to raise capital, primarily to pay a host of warranty claims against the company involving manufacturing defects in the sprayers.

Spreitzer pursued the investment opportunity by first talking to Byron Ross and Richard Rank. Ross was the managing partner of a large accounting firm and was an investor and director of RJ, as well as the company treasurer. Spreitzer had known Ross for nearly thirty years and had been involved with him in other business opportunities in the past. He considered Ross a friend and advisor. Rank was the president of RJ. Some directors wanted to resign from the board after RJ started to receive the warranty claims, and Rank was considering new investors to replace them, including Spreitzer.

Spreitzer talked to several other financial advisors about the investment opportunity in RJ, including an accountant, bankers, and lawyers. He had access to all company records, including financial statements and business plans. He knew RJ was facing the potential for substantial warranty expenses and was aware the company planned to buy out at least one of its investors.

The financial records of RJ also revealed the company had obtained a series of loans from Hawkeye State Bank located in Iowa City. The bank was owned by Russell Gerdin. The president of the bank was Ray Glass. Glass and Ross were friends, and Glass was the individual in the bank who was in charge of the RJ loans. The loans began in 1994 and included a loan to RJ for $1,000,000 in 1997, in addition to two separate loans for $300,000 made within the following nine months.

After completing his investigation, Spreitzer decided to invest in RJ. He invested $200,000 on September 15, 1998, and $200,000 on October 5, 1998.

On November 1, 1998, Spreitzer also signed a personal guaranty together with Ross and Rank. Under the terms of the guaranty, the three

men promised to be personally liable for the company debt to Hawkeye State Bank up to $1.5 million.

Ross had executed a prior personal guaranty of the company debt to Hawkeye State Bank. He asked the bank to release him from his prior guaranty a few weeks before the personal guaranty was executed on November 1, 1998, but the bank refused. Spreitzer was unaware of the request.

Spreitzer continued to put money into the company from time to time, in various amounts, to help RJ meet its obligations. In one instance, he gave Rank $12,000 so RJ could meet its payroll obligation. By December 1999, Spreitzer had infused a total of $740,000 into RJ.

Spreitzer became increasingly concerned about the financial viability of RJ. From October 1998 to September 1999, RJ had accumulated $1.8 million in warranty obligations. Spreitzer personally hired an accountant to review the overall operation of the company in hopes of finding a way to allow it to become profitable. He also hired a management firm. The management firm issued a report in January 2000. The report described the administration of the company as "dysfunctional." It concluded "RJ Manufacturing is terminally ill and without financial restructuring or sale" the company would "eventually be forced to cease operations." The report presented RJ with two options: sale of the company or bankruptcy.

Spreitzer favored bankruptcy, while Ross wanted to avoid bankruptcy. Glass, the bank president, also wanted to avoid bankruptcy, in part to avoid any scrutiny of the bank by government banking regulators.[1]

---

[1]During this time, Glass was engaged in an ongoing embezzlement scheme of bank assets. In 2004, Glass was convicted and sentenced to imprisonment for embezzlement and misappropriation of bank funds, as well as engaging in transactions

Ross proposed that Spreitzer purchase the assets of RJ and start a new company as an alternative to bankruptcy. Spreitzer, with the advice of accountants and attorneys, eventually agreed to form a new company to take over the RJ assets. This company was called Walker Manufacturing, and Spreitzer was its sole shareholder and president.

Walker Manufacturing purchased the RJ assets by obtaining a $1.5 million loan from Hawkeye State Bank to pay off the RJ loan to the bank and purchase the RJ assets. This note was due and payable in March 2001. Additionally, Spreitzer and Ross signed a new personal guaranty of the $1.5 million loan to Walker Manufacturing from Hawkeye State Bank. Ross agreed to personally guarantee the Walker Manufacturing loan as part of Spreitzer's agreement to purchase RJ.

The circumstances surrounding the execution of the personal guaranty form the essence of the claim that gives rise to this litigation. Spreitzer was unwilling to proceed with the purchase if Ross would not join him in signing the personal guaranty of the loan by the bank to the new company. In fact, Spreitzer originally wanted Ross to enter into an indemnification agreement concerning their personal responsibility to the bank for the company's debt. Ross rejected such an agreement, but agreed to cosign the personal guaranty.

The guaranty was signed at the bank on May 10, 2000, in the presence of Glass, Spreitzer, and Ross. It included the following provisions:

> 1. The guaranty was "an absolute unconditional and continuing guaranty."
> 2. The bank "shall not be required to first resort for payment of the indebtedness to borrower or other persons or

---

involving criminally derived property. These crimes were unrelated to the core facts of this case.

their properties, or first to enforce, realize upon or exhaust any collateral security for indebtedness, before enforcing this guaranty."

3. The guaranty was "enforceable against either, any or all the undersigned."

4. The guaranty could "not be waived, modified, amended, terminated, released or otherwise changed, except by a writing signed by the undersigned and a lender."

Notwithstanding these provisions, Spreitzer signed the personal guaranty with an understanding he would only be personally responsible for $750,000 of the bank loan to Walker Manufacturing and that the bank would equally pursue both coguarantors in the event of a default. This understanding was derived from a statement made by Glass in response to a request for clarification made by Spreitzer at the time the guaranty was executed. Spreitzer testified Glass specifically said the bank would collect the personal guaranty "equally" if the new business defaulted on the loan. Glass did not further explain his response, and Spreitzer did not seek a further explanation. Nevertheless, Glass knew at the time that Ross had structured his personal assets to limit his personal exposure to less than $100,000, and Glass knew Spreitzer was relying on the bank to enforce the personal guaranty against Ross. Spreitzer assumed Ross had the means to satisfy his portion of the obligation and further assumed the two men would each pay one-half of the Walker Manufacturing debt in the event the company failed. Spreitzer maintained he would not have agreed to purchase the business if he had known Ross restructured his assets and did not intend to pay his portion of the debt in the event the bank enforced the personal guaranty.

Walker Manufacturing was plagued by financial problems. It also became involved in litigation with a competitor, forcing it to incur substantial legal fees. Other problems hampered the company, including

sale and distribution difficulties. These problems required Spreitzer to infuse money into the company. Between the time Spreitzer purchased the RJ assets in May 2000 and March 2001, he put money into the company nearly every month.

When the Hawkeye State Bank note came due in March 2001, Walker Manufacturing was unable to meet its obligation to pay the note. On March 6, 2001, the bank informed Spreitzer it expected the loan to be paid by March 31 and further informed him that he and Ross were "jointly and individually, 100% liable for the debt."

In response to the notice by the bank, Ross claimed to be judgment proof. Spreitzer, however, agreed to pay the bank $750,000 under two conditions. The first condition was that the bank would release him from further liability under the personal guaranty. The second condition was that the bank would assign its rights under the personal guaranty to allow him to pursue Ross.

After the bank rejected the second condition, Spreitzer agreed to drop the request for an assignment and to pay the bank $750,000 in exchange for a release from the personal guaranty. Spreitzer also wanted the bank to allow him the opportunity to purchase the Walker Manufacturing note and assign its security interest and personal guaranty to him in the event he was able to find a buyer for the Walker Manufacturing assets. A settlement was eventually reached, and Spreitzer paid the bank $750,000. Spreitzer was at all times assisted by legal counsel.

In October 2001, the bank informed Spreitzer that Ross had refused to pay his obligation under the personal guaranty. Consequently, the bank informed Spreitzer it planned to collect the remaining debt from Walker Manufacturing by selling its assets. Walker

Manufacturing eventually surrendered its assets to the bank, except for the lawsuit against the competitor.[2] Spreitzer had invested a total of $663,000 in Walker Manufacturing prior to the sale of its assets. The bank sold the company assets for $850,000.[3] Ultimately, Ross paid nothing on the personal guaranty.

Spreitzer filed an action against Ross, Glass, and Hawkeye State Bank based on fraud, misrepresentation, and breach of fiduciary duty. The fraud claim ultimately centered on the statement by Glass that the bank would enforce the personal guaranty "equally." Spreitzer claimed this promise was the reason he agreed to form Walker Manufacturing and the reason he invested new money of $663,000 before the bank sold its assets.

Some of the claims were dismissed prior to trial, and the case was eventually tried to a jury. The jury rendered a verdict against Ross for $175,000 for fraudulent misrepresentation and nondisclosure. The jury also returned a verdict against Glass for $838,000 for fraudulent misrepresentation. Additionally, the jury determined Hawkeye State Bank was vicariously liable for the actions of Glass. The district court refused to submit Spreitzer's claims for punitive damages to the jury.

Hawkeye State Bank filed an appeal, and Spreitzer cross-appealed. The bank claims the judgment against it must be reversed for four reasons. First, the bank claims there was insufficient evidence of fraud because the evidence produced at trial failed to establish that the pivotal

---

[2]Spreitzer subsequently settled the lawsuit for $500,000 and received a net payment of $319,000. There was evidence in the record of a second lawsuit in which Spreitzer recovered a settlement payment. The impact of this lawsuit was not used by the bank in resolving the issues raised on appeal.

[3]Glass embezzled this sum of money from the bank as part of the ongoing money-laundering and embezzlement scheme he had engaged in for many years while president of the bank.

oral statement by Glass was false (the bank did not, in fact, enforce the personal guaranty against Spreitzer in excess of $750,000) or that it was false at the time it was made. Second, the bank claims there was insufficient evidence that Spreitzer acted reasonably in relying on the pivotal oral statement made by Glass since it was contrary to the language of the written personal guaranty. Third, the bank claims there was insufficient evidence to support damages since the claimed misrepresentation actually reduced Spreitzer's personal liability from $1.5 million to $750,000. Finally, the bank claims there was insufficient evidence to support damages of $838,000 because Spreitzer only claimed the fraudulent misrepresentation caused him to invest an additional $663,000 in the company. Furthermore, the bank points out that Spreitzer netted $319,000 in settling the Walker Manufacturing lawsuit against its competitor.

On cross-appeal, Spreitzer claims the district court erred in refusing to submit its claim for punitive damages to the jury. He also claims the appeal by the bank is moot because the bank failed to appeal from the finding by the jury that it was vicariously liable for the conduct of Glass, and Glass has not appealed from the judgment for fraud entered against him. Thus, Spreitzer claims the bank is vicariously liable for the final judgment against Glass for fraud.

We transferred the case to the court of appeals. The court of appeals reversed the judgment entered by the district court against the bank and affirmed the decision by the district court to refuse to submit the claim for punitive damages to the jury. It found insufficient evidence that Spreitzer reasonably relied on the oral promise by Glass to support fraud since the oral promise was contrary to the written guaranty. It

remanded the case for entry of judgment for the bank. Spreitzer sought, and we granted, further review.

**II. Standard of Review.**

We review a district court judgment on a ruling for judgment notwithstanding the verdict for corrections of errors at law. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 391 (Iowa 2001). We examine whether substantial evidence supports each element of the claim. *Id.* The evidence is viewed in a light most favorable to the nonmoving party. *Id.* " 'Evidence is substantial if a jury could reasonably infer a fact from the evidence.' " *Id.* (quoting *Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641 (Iowa 2000)).

**III. Fraudulent Misrepresentation.**

**A. Res Judicata.** Spreitzer initially claims the bank is precluded from arguing insufficient evidence to support a finding of fraud by the jury. Essentially, Spreitzer claims the unappealed judgment entered against Glass, the bank president, serves as a final adjudication of the claim. He claims this judgment is now binding on the bank under the doctrine of res judicata because the bank did not challenge its vicarious responsibility for the actions of its president in this appeal. Spreitzer principally relies on *Peppmeier v. Murphy*, 708 N.W.2d 57 (Iowa 2005).

In *Peppmeier*, a patient sued her doctor for medical malpractice and the doctor's employer under a theory of vicarious liability. 708 N.W.2d at 59. The district court held the plaintiff failed to establish an applicable standard of care because she had not designated an expert witness for that purpose, and the district court granted summary judgment for both defendants. *Id.* at 61. We transferred the appeal to the court of appeals, and it held the plaintiff could establish the applicable standard of care through the hearsay testimony offered by the

patient of another employee of the doctor's employer. *Id.* Accordingly, the court of appeals reversed the summary judgment against the employer and affirmed the summary judgment in favor of the agent-doctor because the hearsay testimony was not admissible against him. *Id.* The employer sought further review of the decision by the court of appeals, but the plaintiff did not seek further review of the summary judgment in favor of the agent. *Id.* On further review, we held the final judgment in favor of the agent and against the plaintiff barred the plaintiff's subsequent request for further review from a judgment in favor of the principal. *Id.* Spreitzer asserts this principle is not only applicable to judgments against an injured person, but is also applicable to judgments in favor of the injured person.

Judgments for or against an injured party involving claims against persons who have a relationship that makes one vicariously responsible for the conduct of the other may be conclusive against the injured person, the primary obligor, and the vicariously responsible person. *See* Restatement (Second) of Judgments § 51 (1982). However, when the primary obligor and the vicariously responsible person are tried together in one action and only the vicariously responsible defendant appeals from an adverse judgment, it could be unjust to apply the doctrine of res judicata as a bar to such an appeal. In *Peppmeier*, the plaintiff could have sought further review of the judgment, which we later held to bar her claim. 708 N.W.2d at 62. In this case, Spreitzer argues we should bar the bank from seeking further review based on the failure of the agent to appeal. Thus, Spreitzer argues for the offensive use of res judicata to bar defense by a party who did not have the opportunity to appeal the final judgment being used to bar its defense. Notably, the judgment being used to bar the bank's defense was obtained against a

party who was not represented by legal counsel at trial or an appeal. Under the circumstances of this case, it would be unfair to allow the doctrine of res judicata to bar an appeal from a judgment by the vicariously responsible party.

**B. Sufficiency of Evidence.** We recognize eight elements to a claim for fraudulent misrepresentation. *Gibson*, 621 N.W.2d at 400. These elements are:

> (1) [the] defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in [justifiable] reliance on the truth of the representation . . ., (7) the representation was a proximate cause of [the] plaintiff's damages, and (8) the amount of damages.

*Id.* The bank claims the elements of false representation, justifiable reliance, and damages were not supported by sufficient evidence at trial. We turn to the sufficiency of evidence to support the jury's verdict on those elements.

1. *False representation.* The bank argues the oral promise by its president to "equally" enforce the personal guaranty was not false at the time it was made. It also claims the promise was not false because the bank did in fact limit Spreitzer's personal liability under the personal guaranty to $750,000, or one-half of the amount of the debt owed to the bank.

Under the law, a representation must be false at the time it was made to support a claim of fraud, and a representation that was true cannot serve as a basis for a claim of fraud. *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1048 (8th Cir. 2003). Thus, the arguments asserted by the bank require us to examine the representation made by

the bank president at the heart of this case. We first consider if there was substantial evidence that the representation was false.

The representation made by the bank president to equally enforce the personal guaranty gave rise to two interpretations. The bank interpreted the representation as a promise to limit the liability of each guarantor to one-half of the total debt. Spreitzer interpreted the representation as a promise by the bank to pursue both guarantors for payment of the debt up to one-half of the total amount in the event of a default. The distinction between the two interpretations is critical, as revealed by the arguments of the parties.

The bank argues the representation was not false under its interpretation because the bank did in fact limit Spreitzer's liability under the personal guaranty to $750,000. Spreitzer argues the representation was fraudulent under his interpretation because the bank never pursued Ross. He points to evidence that the bank exclusively looked to him for payment under the personal guaranty and never intended to pursue Ross or hold Ross responsible for the debt under the personal guaranty.

An ambiguous representation does not necessarily preclude a claim for fraud. Under the Restatement (Second) of Torts section 527 (1977), a representation known by the maker "to be capable of two interpretations, one of which he knows to be false and the other true" can serve as a basis for fraud if, among other circumstances, the representation is made "with the intention that it be understood in the sense in which it is false."

In this case, the proposal for Spreitzer to buy the assets of the manufacturing company required him to execute a new agreement with the bank to be personally responsible for the company's $1.5 million loan

to the bank. Yet, Spreitzer was unwilling to make the purchase without the help of Ross to share in the personal responsibility for the company debt in the event of a default. Spreitzer initially sought to enter into an indemnification agreement with Ross that would ensure the two men shared the company's debt burden in the event of a default by the company. Ross rejected the agreement with Spreitzer, but agreed to join Spreitzer in signing a personal guaranty and to promise the bank to pay the new debt in the event of a default by the newly formed company. Spreitzer wanted Ross to be responsible for paying one-half of the debt, and the bank knew it.

Under the terms of the personal guaranty, Spreitzer and Ross were separately liable to the bank for the full amount of the debt. Nevertheless, the bank president orally represented to Spreitzer that the bank would enforce the personal guaranty equally between the two guarantors if the company defaulted on the debt. There is substantial evidence that Spreitzer understood this representation to mean the bank would seek payment from both guarantors to satisfy the debt.

Under the circumstances, the representation at issue was capable of two interpretations, and the evidence supported a finding that the bank president intended the representation to be understood as meaning the bank would use its resources to pursue payment of the debt by both guarantors in the event of a default. There was evidence the president of the bank knew Spreitzer would not go through with the asset purchase if Ross was not included in the personal guaranty. There was also evidence to infer the president knew Spreitzer was relying on Ross to help pay the new company's debt in the event of a default and that the president knew Spreitzer was relying on the bank to enforce the personal guaranty against Ross. Yet, the president knew Ross had restructured

his personal finances to severely limit the amount of assets available to creditors. With this evidence, a jury could conclude the bank president made the representation to Spreitzer so that Spreitzer would believe the bank would equally pursue both guarantors in the event of a default. Moreover, a jury could conclude the representation was false when made in light of the evidence that the bank knew at the time of the representation that Ross had restructured his assets so the bank would be unable to collect from him under the personal guaranty. There was also sufficient evidence for the jury to conclude the bank did not comply with the promise to equally pursue Ross. Thus, we conclude there was sufficient evidence in the record to support the false-representation element of the tort.

2. *Justifiable reliance.* The bank claims Spreitzer could not have justifiably relied on the oral representation by the bank president to equally enforce the personal guaranty because the representation was contrary to the terms of the written guaranty and Spreitzer was a sophisticated investor who acted upon the advice of lawyers and accountants. Spreitzer asserts there was sufficient evidence to support the finding of justifiable reliance.

Justifiable reliance is an essential element of a claim for fraud. *In re Marriage of Cutler*, 588 N.W.2d 425, 430 (Iowa 1999). Thus, the plaintiff must not only act in reliance on the misrepresentation, but the reliance must be justified. *Gibson*, 621 N.W.2d at 400.

Like most jurisdictions, we require reliance on the representation to be justified, not reasonable. *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980); *see Field v. Mans*, 516 U.S. 59, 72–74 & n.12, 116 S. Ct. 437, 444–46 & n.12, 133 L. Ed. 2d 351, 363–65 & n.12 (1995) (listing states); *Sutton v. Greiner*, 177 Iowa 532, 536, 159 N.W. 268, 271–72

(1916) (holding defendant's reliance was "justified"). While the terms "justifiable" and "reasonable" are often used interchangeably in addressing the element of reliance, they can describe different approaches. *See Field,* 516 U.S. at 71–74, 116 S. Ct. at 444–46, 133 L. Ed. 2d at 362–65. We simply clarify that the justified standard followed in Iowa means the reliance does not necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and the specific surrounding circumstances. *Lockard,* 287 N.W.2d at 878; *accord* Restatement (Second) of Torts § 545A cmt. *b.* This standard reflects that fraudulent misrepresentation is an intentional tort, and like other intentional torts, recovery is not necessarily barred by the fault of the plaintiff that contributed to the damage. *See* Restatement (Second) of Torts § 545A cmt. *a.*

The justifiable-reliance standard does not mean a plaintiff can blindly rely on a representation. *Lockard,* 287 N.W.2d at 878. Instead, the standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance element has been met. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir. 2003); *see also Lockard,* 287 N.W.2d at 878 (justifiable-reliance element viewed in light of plaintiff's own information and intelligence).

The federal courts have outlined a host of relevant factors to consider in federal securities fraud cases and rule 10b–5 violation cases to determine if reliance by a plaintiff on a misrepresentation claim is justified. *See Davidson v. Wilson,* 973 F.2d 1391, 1400 (8th Cir. 1992); *see also Zobrist v. Coal-X, Inc.,* 708 F.2d 1511, 1516 (10th Cir. 1983). Our common-law fraud claim parallels the federal fraud claim, and these

factors are helpful in determining the justifiable-reliance element of our common-law fraud action. The relevant factors are:

> "(1) the sophistication and expertise of the plaintiff in financial . . . matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the . . . transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations."

*Davidson*, 973 F.2d at 1400 (quoting *Zobrist*, 708 F.2d at 1516). Our own cases have previously identified some of these factors. *See Lockard*, 287 N.W.2d at 878.

An additional factor has been identified in cases involving oral representations. This factor considers whether the oral representation clearly contradicts a written agreement. *See In re Access Cardiosys., Inc.*, 404 B.R. 593, 649 (Bankr. D. Mass. 2009).[4] In such instances, reliance on the oral representation by a plaintiff can be utterly unjustified in the face of a clear written contradiction. *See Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1031 (Mass. 2004). An example of the circumstances when reliance by a plaintiff on an oral representation that

---

[4]Some courts consider the contradiction between an oral representation and a written agreement either as a separate factor to use in deciding if reliance is justifiable or as a circumstance to consider in conjunction with the third factor involving plaintiff's access to relevant information. *Compare, e.g.*, *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 805 (1st Cir. 1997) (considering oral misrepresentation at odds with a written memorandum as part of the third factor); *with In re Access Cardiosys., Inc.*, 404 B.R. at 649 (stating courts consider oral representations that contradict written material as an additional factor). Other courts consider the parol evidence rule in addressing claims of fraud based on oral misrepresentations that contradict written agreements, especially integrated agreements. Nevertheless, almost all courts recognize the issue is primarily one of whether the plaintiff is justified in relying on the promise. Consequently, most courts inevitably recognize that the application of the parol evidence rule by a judge to avoid altering the terms of a written agreement "is not necessarily equivalent to the judge's obligation to direct a verdict for a defendant on the basis that there could be no reasonable reliance as a matter of law." *Gen. Corp. v. Gen. Motors Corp.*, 184 F. Supp. 231, 238–39 (D. Minn. 1960). In this case, the bank did not argue that the parol evidence rule played a role in the resolution of this issue.

is directly contrary to a written agreement is unjustified can be found in *Smidt v. Porter*, 695 N.W.2d 9 (Iowa 2005). In *Smidt*, we determined that a former employee could not establish a claim for fraud against a former employer based on an oral promise of long-standing employment and benefits allegedly made by the employer when the former employee had unsuccessfully attempted to negotiate such terms as a part of a written employment contract that did not include the disputed terms. 695 N.W.2d at 22–23. This approach is consistent with the established view that the justifiable-reliance element means a plaintiff cannot close his or her eyes to an obvious contradiction. *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 805 (1st Cir. 1987).

The bank argues Spreitzer was not justified as a matter of law in relying on the oral representation to pursue both guarantors equally. Primarily, the bank relies on the inconsistency between the oral representation and the terms of the guaranty that permitted the bank to collect from a single guarantor, as well as the evidence presented during trial that Spreitzer was a sophisticated investor who acted on the advice of several professionals in making his decisions to purchase the RJ assets and to sign the guaranty.

We acknowledge many of the factors favor a finding in this case that the reliance was unjustified. Yet, no one factor is dispositive in determining if reliance by a plaintiff is justified, and the scale is tipped in one direction or the other only by a balance of all of the factors. *See Zobrist*, 708 F.2d at 1516–17. We recognize the oral representation in this case was somewhat vague and was inconsistent with the term of the written guaranty that permitted the bank to pursue collection of the debt against one guarantor. On the other hand, the parties to the transaction were friends and engaged in a face-to-face exchange over the manner in

which the guaranty would be enforced. They did not resort to the language of the written personal guaranty when discussing questions of enforcement, and the bank president admitted he told Spreitzer the bank would pursue both guarantors in the event of a default. Moreover, the bank president was authorized to alter terms of the written agreement.

This case did not rise to the level of the circumstances presented in *Smidt*. In this case, the parties did not negotiate the terms of the personal guaranty, but signed a standard form agreement. The bank president did not rely on the terms of the written agreement to guide the discussion prior to the execution of the agreement, but guided Spreitzer by his oral representations. Unlike *Smidt*, there was no evidence the written guaranty was a product of the give and take of negotiations by the parties so as to make it unjustified for a party to rely on an oral representation covered by the negotiations that was clearly inconsistent with the written agreement. *See Robinson v. Perpetual Servs. Corp.*, 412 N.W.2d 562, 567 (Iowa 1987) (recognizing fine print, boilerplate written contract terms may not reflect the intentions of the parties to the contract).

Normally, the decision whether or not reliance by a plaintiff is justified is one for the fact finder to resolve. *See Holcomb v. Hoffschneider*, 297 N.W.2d 210, 213 (Iowa 1980); *Christy v. Heil*, 255 Iowa 602, 611, 123 N.W.2d 408, 413 (1963). After considering all the circumstances, we conclude this case does not create an exception to this general rule. This conclusion is not to say that integrated written contracts cannot thwart a claim for fraud based upon an oral representation clearly inconsistent with the contract. We only conclude the finding of justifiable reliance made by the jury in this case was supported by the evidence.

3. *Damage caused by misrepresentation.* An essential element of fraud requires the plaintiff to show the fraud resulted in damage. *Sanford v. Meadow Gold Dairies, Inc.,* 534 N.W.2d 410, 413 (Iowa 1995). Fraud without resulting injury is not actionable. *Vorpahl v. S. Sur. Co.,* 208 Iowa 348, 352, 223 N.W. 366, 368 (1929).

Spreitzer sought damages in the form of his lost investment in the business in the amount of $663,000 and the payment he made under the personal guaranty of $750,000 after the company defaulted on its loan obligations. He supported these claims primarily with his testimony that he would not have agreed to buy the RJ assets, sign the personal guaranty, and invest in a new company if he had known the bank would not enforce the personal guaranty equally between the coguarantors.

The bank provides two primary arguments in support of its position that the damages Spreitzer claims were not caused by his reliance. First, the bank claims Spreitzer lost his investment of $663,000 due to the continued financial decline of the business based on factors unrelated to a promise to equally enforce the personal guaranty. In the bank's view, the business failed due to product design problems, insufficient sales, and a lack of new investors. Second, the bank claims the decision to agree to the personal guaranty—found by the jury to be fraudulently induced—could not have caused any damage to Spreitzer because it was merely a continuation of a prior obligation by Spreitzer to be personally responsible for RJ's debt, which was not alleged to have been induced by fraud.

The challenge by the bank to the damage award is tied to the causation element of a claim for fraud. Often, damages and causation are intertwined concepts. *See Midwest Home Distrib., Inc. v. Domco Indus. Ltd.,* 585 N.W.2d 735, 739 (Iowa 1998). In this case, the bank's

first argument does not speak so much to the amount or measure of damages as it does to the absence of evidence to show the specific damages claimed by Spreitzer, and awarded by the jury, were caused by the misrepresentation.[5]

As with other torts, it is generally recognized the causation element of a fraud claim is composed of both factual and legal causation of the loss. *See* W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 110, at 767 (5th ed. 1984) [hereinafter *Prosser & Keeton*]. Under the Restatement, the fraudulent misrepresentation must not only be a factual cause of the loss, but it must also be a legal cause. Restatement (Second) of Torts §§ 546 (factual cause), 548A (legal cause). Each must be satisfied.

The factual causation component addresses the question whether the representation, that is believed to be true but is actually fraudulent, caused the losses in some way. If the plaintiff did not rely on the representation in entering into the transaction in which the losses were suffered, the representation is not in fact a cause of the loss. Restatement (Second) of Torts § 546 cmt. *a.*

In this case, sufficient evidence was presented to support a finding by the jury that the misrepresentation to equally enforce the personal guaranty was a factual cause of the losses suffered by Spreitzer. Based on the evidence, the jury could have found Spreitzer would not have

---

[5]Spreitzer impliedly suggested that the damage claims in the case involved out-of-pocket damages. Generally, Iowa law recognizes two basic methods to measure damages in fraud cases. *Midwest Home Distrib.*, 585 N.W.2d at 739. The first measure of damages provides compensation for the benefit of the bargain. *Id.* The second measure of damages is the out-of-pocket rule. *Id.* However, these measures of damages have primarily been developed in cases of fraud involving the transfer of property. Yet, even when property is not transferred between the defendant and the plaintiff, a defrauded plaintiff is entitled to recover those losses proximately caused by reliance on the misrepresentation.

suffered the losses he claims because he would not have invested in the business and would not have signed the new personal guaranty that was ultimately enforced against him if he had known the representation was false. In applying the "but for" test of factual causation, we conclude there was sufficient evidence that the losses claimed would not have occurred "but for" Spreitzer's reliance on the false representation. *See Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 884 (Iowa 2009) (explaining "cause in fact").

The legal causation component goes further to address the question whether the losses that in fact resulted from the reliance were connected to the misrepresentation in a way to which the law attaches legal significance. *Kelly v. Sinclair Oil Corp.*, 476 N.W.2d 341, 349 (Iowa 1991) (explaining second component of causation as "the question of whether the policy of the law will extend responsibility to those consequences which have in fact been produced by an actor's conduct"); *see also* Restatement (Second) of Torts § 548A cmt. *a.*

Legal causation is a critical component of the causation element of the tort of fraud. Without legal causation, the chain of losses resulting from an investment would be virtually limitless. *See Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 762 (7th Cir. 1998) (explaining importance of requiring more than mere "but for" causation in assigning legal responsibility for a plaintiff's loss).[6] Contractual counterparties

---

[6]The separate requirements of factual causation and legal causation have been developed in federal security fraud cases wherein the concepts are known as "transaction causation" and "loss causation." *Movitz*, 148 F.3d at 763. "Transaction causation" is met when the plaintiff shows the misrepresentation caused the plaintiff to make the investment (i.e., where the plaintiff shows that, if the plaintiff had known the truth, the plaintiff would not have made the investment). *Bruschi v. Brown*, 876 F.2d 1526, 1530 (11th Cir. 1989). "Loss causation" requires the plaintiff to additionally show that the false representation touches upon and relates to the reasons for the investment losses suffered. *Id.*

would become virtual insurers against the risks inherent in business investing.

The modern trend is to refocus the analysis of legal causation from the foreseeability of harm to a risk-based standard. *See* Restatement (Third) of Torts, *Liability for Physical Harm* § 29 cmt. *j* (Proposed Final Draft No. 1 2005). In negligence cases causing physical harm, tort liability now focuses on whether the risk that produces liability actually caused the damages suffered. *Id.* § 29. The scope of liability is limited to harms that result from the risks that made the actor's conduct tortious. *Id.* The shift in analysis has primarily occurred to clarify the often confusing concept of legal causation, not to change the substantive scope of liability. *Id.* § 29 cmt. *j* (explaining analytical connection between reasonable foreseeability and risk-based standards).

We readily acknowledge legal causation for intentional torts often reaches a broader range of damages for harm than legal causation reaches in cases involving unintentional torts. *See id.* § 33(b). This principle may also apply to intentional torts involving nonphysical harm, including fraud actions involving lost investments. Nevertheless, "[t]he cases are in accord that even a willful or intentional [tortfeasor] does not become an insurer of the safety of those whom he has wronged." *Johnson v. Greer*, 477 F.2d 101, 106 (5th Cir. 1973). As with the scope of liability for unintentional torts, "intentional and reckless tortfeasors are not liable for harms whose risks were not increased by the tortious conduct, even if that conduct was a factual cause of the harm." Restatement (Third) of Torts, *Liability for Physical Harm* § 33(c) & cmt. *f.*

Even though the authors of the venerable Prosser treatise on torts have traditionally used foreseeability to frame this component of legal

causation, the substantive rule that has been charted essentially remains unchanged:

> In general and with only a few exceptions, the courts have restricted recovery to those losses which might have expected to follow from the fraud and from those events that are reasonably foreseeable. . . . But if false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors [that] in no way relate to the representations[,] will not afford any basis for recovery. It is only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered.

*Prosser & Keeton*, at 767.

Stated in terms of risk instead of foreseeability, this principle limits the scope of liability for tortious conduct by requiring the conduct to have "enhanced (at the time the defendant acted) the chances of the harm occurring or that it would increase the chances [(risk)] of a similar accident [(harm)] in the future if the defendant should repeat the same wrong." *Zuchowicz v. United States*, 140 F.3d 381, 388 n.7 (2d Cir. 1998). In other words, a tortfeasor " 'is not liable to a person whom he intended to harm and who has been harmed, unless from the standpoint of a reasonable man, his act has in some degree increased the risk of that harm.' " *Johnson*, 477 F.2d at 107 (quoting Restatement of Torts § 870 cmt. *g* (1939)).

This risk-based approach is compatible with a long-established principle of legal causation, reflected in time-honored cases. For example, in *Berry v. Sugar Notch Borough*, 43 A. 240 (Pa. 1899), a speeding trolley car was struck by a falling tree. The court held the causation requirement was not met. *Id.* at 240. "This result was correct since, although the accident would not have occurred but for the trolley's

speeding, speeding does not increase the probability of trees falling on trolleys." *Zuchowicz*, 140 F.3d at 388 n.7.

Spreitzer acknowledges the factual-causation element of a fraud claim, but suggests we have relaxed the legal-causation component in fraud cases involving investments by requiring nothing more than a showing that the plaintiff would not have made the investment if the truth of the misrepresentation had been known. Spreitzer relies on *Midwest Management Corp. v. Stephens*, 353 N.W.2d 76 (Iowa 1984), to illustrate this point.

In *Stephens*, an investment corporation invested $400,000 in a securities venture proposed by three entrepreneurs. 353 N.W.2d at 82. The investment made by the corporation was based on a representation by a director of the corporation, who was also the father of one of the entrepreneurs, that the director and the three entrepreneurs would personally invest in the new venture by acquiring stock. *Id.* at 78. The investment corporation wanted the instigators of the business venture to have a personal stake in the venture as an incentive to operate the business profitably. *Id.* The instigators never invested in the business as promised, and the business failed. *Id.* at 80.

In holding the investment corporation was entitled to recoup its lost investment as damages based on the false promise that the entrepreneurs would also personally invest in the venture, we observed, as in this case, the plaintiff would not have invested in the venture but for the misrepresentation. *Id.* at 82. We also observed, as in this case, that there was ample evidence that the venture would have failed even if the promise had been true. *Id.* Based on these observations, *Stephens* appears on the surface to support Spreitzer's position.

In *Stephens*, the investment made by the plaintiff in the venture was recoverable as damages, not only because the plaintiff corporation would not have invested in the venture if it knew the representation was false, but also because the promise made and relied upon as truthful was calculated to minimize the risk of investing in the venture. Based on plaintiff's belief that the venture would be less likely to fail if those operating it had their own money invested in the venture, the falsity of the promise increased the risk of the damage suffered. Thus, the losses (loss of invested funds) that did in fact occur by entering into the transaction were also losses whose risks were increased by the falsity of the promise (greater risk of losing invested funds if the entrepreneurs are not personally invested). Legal causation was established in *Stephens* by the presence of facts that showed the type of false promise increased the scope of damages, but only because the risk of harm increased as a result of the false promise. The damages sought by plaintiff (invested funds) were within the risk of harm covered by the false promise.

Thus, legal causation in fraudulent-representation cases requires, at a minimum, that the tortious aspect of the conduct increased the risk of the damages claimed. This amount of damage is distinguishable from the greater universe of losses caused by the mere fact that a false representation induced the investment. That is, the plaintiff must show not only that the reliance would not have occurred but for the defendant's decision to misrepresent the truth, but the plaintiff must also show that the fact misrepresented increased the risk of the specific damages claimed.

Thus, in considering legal causation, we return to the false representation at issue. The representation concerned the term of the

personal guaranty that the bank would equally pursue the coguarantors in the event of a default by the business on its $1.5 million loan.

In the procedural context of this case, we must apply the rules for legal causation to the bank's challenge to the sufficiency of the evidence to support the jury verdict. With all these guiding principles in mind, the question becomes whether substantial evidence exists in the record to support a jury finding that the false promise to equally pursue the coguarantors increased the risk of damages amounting to $838,000.

We begin with the loss suffered by Spreitzer through the investment he made in the business. The question is whether the fact Glass did not intend to equally pursue the coguarantors increased the risk Spreitzer would lose his investments.

Generally, an investor invests in a business operation to obtain a return on the investment through the receipt of profits from the operation of the business, through the future sale of the business at a profit, or through the sale of the investor's interest in the business. In this case, the business purchased by Spreitzer failed within a relatively short period of time, and Spreitzer never realized any operational business profits from his investment of $663,000. Spreitzer failed to explain how the false promise to equally enforce the personal guaranty of the business debt between the coguarantors increased the risk of unprofitability of the business, and we can discern no such explanation from the record. He did not show the business would have produced a return on his investment if the bank would have pursued his coguarantor. For sure, all the evidence revealed the business would have failed to be profitable even if the bank would have pursued Ross equally as promised. Consequently, the misrepresentation was not a legal cause of the loss of the $663,000 invested by Spreitzer in the company.

We next consider whether or not the misrepresentation was a legal cause of the payment of $750,000 by Spreitzer under the personal guaranty. The bank had the contractual right to bypass Walker Manufacturing and demand satisfaction of the debt from Spreizter. This meant that even if the bank had pursued satisfaction of the Walker Manufacturing loan from Ross as represented, Spreitzer was still obligated to pay up to $750,000. Thus, the falsity of the promise to pursue the coguarantors equally did not increase the risk Spreitzer would have had to pay $750,000 under the personal guaranty.

Finally, we consider whether the falsity of the bank's promise increased the risk Spreitzer would lose some portion of his interest in the assets of Walker Manufacturing. When a creditor bypasses the assets of a debtor and collects the debt from a guarantor under the terms of a personal guaranty, the guarantor may assert rights of reimbursement against the debtor to recoup the amount paid on the guaranty.[7] *See Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 772 (Iowa 2009)

---

[7]The term "reimbursement" is contrasted here with the related concept in the law of suretyship, "subrogation." "Reimbursement" is a legal remedy for a guarantor in an implied surety contract between the guarantor and primary debtor in a three-party loan contract. Restatement (Third) of Suretyship and Guaranty § 22 cmt. *a* (1996). Some courts may use the term "subrogation" to refer to a "bundle of rights" against the primary debtor that a guarantor possesses after fulfilling the underlying obligation to a creditor, including the right to reimbursement from the primary debtor. 38 Am. Jur. 2d *Guaranty* § 120, at 971 (1999); *see also In re XTI Xonix Tech. Inc.*, 156 B.R. 821, 827 (Bankr. D. Or. 1993) (noting that, under Oregon law, "[subrogation] consists of the rights of indemnity (or reimbursement), contribution, subrogation and exoneration"). In contrast, the Restatement defines "subrogation" as an equitable assignment of the creditor's rights to the guarantor, an enforcement mechanism with which the guarantor may be more adequately assured of reimbursement from the primary debtor. *See* Restatement (Third) of Suretyship and Guaranty §§ 27 cmt. *a*, 18 cmt. *b*, 28 cmt. *c*. In most cases, the rights under the two remedies will not differ significantly. *Id.* at § 28 cmt. *c*. However, a guarantor is eligible for subrogation only when the underlying obligation to the creditor has been fully satisfied, regardless of any limit on the amount of debt the guarantor agreed to pay. *Id.* at § 27 cmt. *b*; *Am. Sur. Co. of N.Y. v. Westinghouse Elec. Mfg. Co.*, 296 U.S. 133, 137, 56 S. Ct. 9, 11, 80 L. Ed. 105, 109–10 (1935). Spreitzer did not pay the entire underlying debt to the bank in this case. Consequently, we use the reimbursement remedy for the rights at issue and do not address any associated right to subrogation.

(adopting the Restatement (Third) of Suretyship and Guaranty position on reimbursement); 38 Am. Jur. 2d *Guaranty* § 120, at 971–72 (1999). Any assets of the company would be available to the coguarantors under claims of reimbursement for payments made to the bank. Thus, the bank's failure to pursue Ross as promised increased the likelihood the bank would collect the remaining portion of the debt from the company, which would diminish or exhaust the assets of the company available to Spreitzer under either a claim for reimbursement or a claim of ownership. Therefore, the falsity of the representation increased the likelihood Spreitzer's reimbursement or ownership interests would be less valuable. In this way, some damages could satisfy the legal causation rule applied in this case.

While some damages relating to the diminution of company assets could satisfy the legal causation standard, the amount would be limited by legal causation to those assets that were likely diminished by the tortious aspect of the bank's conduct. The tortious aspect of Glass' conduct was the falsity of his representation regarding equal enforcement of the guaranty. Even though the falsity of the promise increased the likelihood the bank would forego satisfaction from Ross, the falsity of the promise did not affect the *amount* of money the bank would have actually collected from Ross were the guaranty to be enforced equally. Consequently, Spreitzer's losses cannot exceed the amount of money he would have recovered from the company if the bank had equally pursued both coguarantors as promised.

The evidence at trial supported a finding that the company was ultimately sold for $850,000. It also supported a finding that the value of the company's interest in the litigation was $319,000. The bank received the $850,000 in satisfaction of the remaining debt obligation,

and Spreitzer received the litigation proceeds of $319,000. In determining the amount of damages, the ultimate question in this case is what amount of the total company assets ($1.069 million) would Spreitzer have received if the representation had been true—if the bank had pursued Ross. While it is apparent Spreitzer was damaged in some amount as result of the misrepresentation, this amount is far from the jury award of $838,000.

For example, if the bank had pursued Ross as promised and recovered $750,000 from him as contemplated by Spreitzer, then Spreitzer and Ross would have had the company assets of $1.069 million ($750,000 plus $319,000) available to them to satisfy their claims for reimbursement.[8] Having paid the bank the debt of $1.5 million, the two guarantors could have each netted $534,500 in company assets. As it turned out, Spreitzer only received $319,000 in company assets. Thus, Spreitzer would have been damaged by the false representation in the amount of $215,500 under this scenario.

On the other hand, if the bank had pursued Ross as promised but recovered nothing from him, the company assets actually received by the bank ($850,000) and Spreitzer ($319,000), as shown by the evidence, would be the same amounts they would have received if the bank had performed its promise. In this event, the falsity of the representation would not have increased the risk of any of the damages claimed by Spreitzer. Of course, if the bank had pursued Ross as promised and recovered some amount, but an amount less than $750,000, then

---

[8]Although the face value of the bank note was $1.5 million, the bank ultimately recovered $1.6 million. While not explained by the record, the bank was apparently entitled to the additional amount, which means the bank would have also been entitled to receive this amount before Spreitzer and Ross would have been entitled to any reimbursement from the company assets.

Spreitzer's damages would fall between the two extremes based on the amount recovered from Ross by the bank.

We conclude there was insufficient evidence to support the jury award of $838,000. The record does not contain evidence of $838,000 of damages that were increased by the tortious aspect—the falsity—of the fraudulent misrepresentation at issue. The evidence at trial would have supported an award of some amount of damages, but there was clearly insufficient evidence of damages of $838,000.

The bank requests that we remand the case for entry of judgment in an amount supported by the evidence. We acknowledge this is a procedure we have followed in the past when the amount of a jury award was found to be unsupported by the evidence. *See Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 834 (Iowa 1998). However, the amount of the award will depend upon findings of fact, which is not our role under the applicable standard of review. As we will subsequently conclude, however, the district court erred in failing to submit Spreitzer's punitive-damage claim to the jury. Thus, the case must ultimately be remanded for a new trial, and it would be appropriate under the circumstances of this case for the new trial to include both claims of compensatory and punitive damages.

In summary, the claim for compensatory damages under the theory of liability determined by the jury in this case will involve a two-step process on retrial. The jury must first determine the amount of money the bank would have recovered from Ross if the bank had equally pursued both guarantors under the personal guaranty. Based upon this amount, the jury must then determine any additional amount (over the $319,000 received) Spreitzer would have netted in a claim for reimbursement against the company.

### IV. Punitive Damages.

Punitive damages may be awarded in an action for fraud when, in conjunction with the fraud, the defendant acts with legal malice or engages in other aggravating conduct amounting to actual malice. *See Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 176 (Iowa 1990). Legal malice involves wrongful conduct committed "with a reckless disregard of another's rights." *Stephens*, 353 N.W.2d at 82.

The district court rejected the claim for punitive damages based on evidence that the bank president partially complied with his promise to equally enforce the personal guaranty by limiting Spreitzer's personal liability to one-half of the total debt. In other words, the district court found the bank did not perpetrate the fraud in order to collect the entire debt from Spreitzer. The district court also found the bank president hoped Spreitzer would succeed with his new business. It also pointed out Spreitzer was a sophisticated investor and was not financially vulnerable. The bank echoed these arguments on appeal in support of its claim that the district court did not err in granting a directed verdict on punitive damages.[9]

The fraudulent conduct in this case consisted of the promise to equally enforce the personal guaranty between the two guarantors. There was evidence Spreitzer would not have purchased the business without the promise. There was also evidence the company would likely have been forced into bankruptcy if Spreitzer would not have agreed to the takeover. Consequently, the fraud was a key component to Spreitzer's decision to take on the risk of purchasing the business.

---

[9]The bank did not claim on appeal, nor did the district court determine at trial, that the bank cannot be liable for punitive damages based on the conduct of an employee. *See* Restatement (Second) of Torts § 909 (punitive damages properly awarded when agent was manager and acted within scope of employment).

Although the bank president may have wanted Spreitzer to succeed in the business, the jury could have found his desire was primarily motivated by his own greed and self-interest. He only wanted Spreitzer to succeed as a means for his own success, and he purposely misled Spreitzer into believing Ross would help absorb the company debt if the business failed.

Even sophisticated and wealthy investors have a right to truthful investment information. The bank president acted with his interests in the forefront in making the false promise, and there was sufficient evidence from which a jury could conclude that the promise was made with a conscious and reckless disregard for the rights of Spreitzer. The bank president knew the company was failing, and he knew it required a capital investment to have any hope of survival. In the event of a default on the note by the company, he also knew that Ross would not be available to help Spreitzer satisfy the company's debt to the bank. This is the type of conduct that can give rise to punitive damages, and it was a question the jury should have been able to decide. Consequently, Spreitzer is entitled to a new trial to allow the jury to determine the punitive damage claim.[10]

### V. Conclusion.

We have fully and carefully considered all claims raised by the parties on the appeal and cross-appeal. We vacate the decision of the court of appeals and reverse the judgment of the district court. We conclude Spreitzer is entitled to a new trial on issues of compensatory

---

[10]Punitive damages would only be recoverable if Spreitzer recovers compensatory damages. *See Pringle Tax Serv., Inc. v. Knoblauch*, 282 N.W.2d 151, 154 (Iowa 1979) (stating the general rule that compensatory damages must be established before punitive damages may be awarded). If Spreitzer fails to prove damages caused by reliance on the misrepresentation on retrial, punitive damages will not be recoverable.

and punitive damages. Compensatory damages shall be calculated in the manner described in this opinion, and punitive damages shall be submitted on the theory of liability used to support the prior finding of fraud.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED AND CASE REMANDED FOR NEW TRIAL.**

All justices concur except Baker, J., who takes no part.