# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1347

_____

Lakeside Feeders, Inc.,       *
     *
           Appellant,     *
     *  Appeal from the United
        v.            * States District Court for
     *  the Southern District of Iowa.
Producers Livestock Marketing    *
Association, a Non-Stock Nebraska   *
Corporate Cooperative; Producers    *
Livestock Credit Corporation, a     *
Non-Stock Nebraska Corporation,    *
     *
           Appellees.     *

_____

Submitted: September 20, 2011
Filed: January 23, 2012

_____

Before LOKEN, BEAM, and MURPHY, Circuit Judges.

_____

BEAM, Circuit Judge.

Lakeside Feeders appeals from the district court's[1] grant of summary judgment in favor of Producers Livestock Credit Corporation and Producers Livestock Marketing Association (Producers) on Lakeside's state-law claims for fraudulent

_____

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

misrepresentation, negligent misrepresentation and unjust enrichment. We affirm the court's resolution of these state law matters in favor of Producers.

## I.    BACKGROUND

Relevant here, Producers provides livestock marketing services, hedging services, and lending services to producers of hogs in the central part of the United States.  On or about December 2007, an Iowa veterinarian, Dr. Tracy Gayer, along with his wife, together doing business as Prairie Pork, Inc. (hereinafter Gayer), entered into an agreement with Producers identified as the "Hog Program."  Very generally, under this program, Producers advanced funds so that Gayer could acquire hogs and raise them from weaned pigs to market weight.  Specifically, the Hog Program contemplated that Producers would advance seventy percent of the projected value of each market hog entering the program and use it to pay feed bills as long as Gayer maintained his thirty-percent equity requirement.  The Program contract referred to Producers as "Owner" and Gayer as "Feeder."

Lakeside feeds, grows, and ultimately delivers to market pigs purchased and owned by others.  Gayer approached Lakeside in late 2007 about using its services for the pigs at issue.  As relevant here, Lakeside provided the feed and care for the hogs at issue by way of a handshake agreement; there was no written contract memorializing any agreement between Lakeside and Gayer, or between Lakeside and Producers.  Once the hogs reached market weight, Lakeside sold the hogs and collected and forwarded the proceeds to Producers. Lakeside looked to Producers for payment for its services because Producers, along with Gayer, received the Lakeside billing for the feed and management of the pigs delivered to Lakeside under the Hog Program.  Producers paid these bills without incident, it seems, until around mid-2008.  Producers continued to send payments to Lakeside throughout 2008, sometimes hundreds of thousands of dollars, but Lakeside's outstanding bills mounted. The time frame at issue coincides with a substantial decline in the value of

market hogs. To quote Lakeside, it was "one of the worst hog marketing periods in history with ethanol demand driving input costs sky high and hog sale prices precipitously dropping to an all time low."

Around May 2008, Gayer failed to provide his share of funding to Producers under the terms of the agreement, violating the equity ratio mandated by the Hog Program. Accordingly, Producers communicated to Gayer that he needed to send money to Producers so that it could continue to pay feed bills and get its own contract with Gayer back into compliance with the seventy percent debt-on-the-finished-hog value. Meanwhile, Producers communicated with Lakeside regarding Lakeside's mounting outstanding feed bills. Although Lakeside knew that Producers provided the financing for the hogs at issue, there is a fact dispute about whether Lakeside was aware of the seventy percent lending limit agreed upon by Producers in the Hog Program with Gayer, or other details of the deal. Producers claims it educated Lakeside about this term of the contract and Lakeside denies this knowledge. We, of course, must resolve this factual dispute in Lakeside's favor and assume it was not aware of the specific financing relationship or other terms under the Hog Program.

The heart of Lakeside's tort claims centers around alleged representations purportedly made by Producers to Lakeside that "when we get paid, you will get paid," or as Lakeside repeatedly claims, "Producers represented *it would pay* Lakeside's bills." Presumably Lakeside took this to mean either that Producers would "pay Lakeside in full," or possibly that Lakeside would be "paid first" because Lakeside's primary complaint is that Producers unjustly paid itself off, including payment of Producers' non-feed-cost fees under the Hog Program. In any event, many of Lakeside's feed bills were left unpaid. However, even though Lakeside repeatedly argues that Producers represented to Lakeside that Lakeside "would be paid," this merely reflects what Lakeside believed at the time and is not a verbatim recitation of Producers' statements in the record. Based upon oral conversations with Producers, Lakeside's president, James Noethe, testified that "[Producers] received

-3-

all the money and said that as they received more money I would get my outstanding bills paid." Noethe also stated, "I guess I trusted them that they would do that, and that's why I kept sending them all the money [from the hog sales] with basically all the outstanding bills that I had there at the end of the feeding period."

In addition to the oral representations, we look also to Producers' written representations, which vary from Noethe's testimony in small, but significant, ways. Faxes from Producers to Lakeside accompanying wire transfers made during the relevant time period contained a listing of "outstanding feedbills . . . owed to Lakeside Feeders." One such fax prefaces such a list with a statement that "[t]he following page shows the outstanding feedbills that Producers is aware of that Tracy Gayer owes." Producers also repeatedly stated in the faxes that "[w]e are at our . . . lending limits until we receive money from Tracy or sell more hogs," "[w]e are expecting more money from Tracy so that we are able to pay more feedbills," and that "Producers hopes to have all the outstanding feedbills paid very soon." These same faxes delineate outstanding bills for "[Producers] Financed hogs" and "NON-[Producers] Financed hogs." Producers stated in faxes that it did not pay outstanding bills on Non-Producers financed hogs.

Lakeside claims it relied upon the communications from Producers wherein, according to Lakeside, Producers represented to Lakeside that Lakeside "would be" paid when one of two circumstances occurred: (1) when Producers received more money from Gayer, or (2) when Lakeside sold more hogs. Additionally, Lakeside claims that Producers was fully aware at some point in late August 2008 that even though Producers would be paid in full for monies advanced, Lakeside would not be fully reimbursed and that Producers never informed Lakeside of that circumstance despite Producers' knowledge. Lakeside brought this diversity tort action against Producers in federal court seeking $922,841.45 in unpaid bills and claiming

-4-

Producers' actions induced Lakeside to forego taking protective measures such as filing a lien[2] to protect its interests.

The district court granted summary judgment in favor of Producers on each of Lakeside's Iowa state-law tort claims. On Lakeside's fraudulent misrepresentation claim, the court held that even assuming the statements at issue were material, Lakeside failed to produce any evidence that they were false when made, a necessary element of the claim. The court also held that Lakeside failed to establish that it justifiably relied upon Producers' representations in its decision to continue extending credit. In doing so, the court reiterated that even though Producers paid the bills, it repeatedly notified Lakeside that it had reached its lending limit and was thus unable to advance more funds until it, too, received additional funds. The court also noted Lakeside's expertise and history in this business, recognizing Lakeside's level of sophistication as proof that Lakeside should not have blindly relied on any alleged representations by Producers.

As to any alleged fraudulent nondisclosure, the court held that Lakeside failed to produce evidence in support of its assertion that Producers knew at some discrete time that it would not generate enough revenue from sales to satisfy Lakeside's bills. The court further held that Producers was under no legal duty to communicate any internal speculations to Lakeside because there was no business relationship between the two. Here, again, the court emphasized Lakeside's level of sophistication in support of its conclusion that Lakeside was equally aware, if not more keenly aware, of any shortfall with regard to the gross market value of the hogs.

The district court also rejected Lakeside's negligent misrepresentation claim. Lakeside alleged that Producers made many representations with the sole purpose of

---

[2]Chapter 570A of the Iowa Code creates an agricultural supply dealer's lien.

attempting to improve Producers' pecuniary interest by inducing Lakeside to continue feeding and managing Producers' pigs. As is the case in all negligence actions, though, Lakeside was required to establish that Producers had a duty toward Lakeside to supply information, which the court held did not exist in this case.

Finally, as to Lakeside's claim for unjust enrichment, the court held that while Producers received a benefit from receipt of funds from Lakeside's sale of the animals, that, in the absence of Gayer's payment of its debt to Producers which might have otherwise gone to pay Lakeside's feed bills, there is no evidence that Producers was enriched at the *expense* of Lakeside. Producers was entitled to recover as it did because its agreement with Gayer entitled it to recover its due bills prior to other creditors.

Lakeside appeals.

## II.    DISCUSSION

### A.    Standard of Review

We review the district court's decision to grant a motion for summary judgment de novo, viewing all evidence most favorably to, and making all reasonable inferences for the non-moving party. Washington v. Countrywide Home Loans, Inc., 655 F.3d 869, 871 (8th Cir. 2011). We will affirm the grant of summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, because this case is before the court on diversity jurisdiction, "[t]his [c]ourt will apply the substantive law of the forum state," Iowa. Callas Enters. v. Travelers Indem. Co. of Am., 193 F.3d 952, 955 (8th Cir. 1999) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).

## B.     Fraudulent Misrepresentation

Under Iowa law, to prevail on a fraudulent misrepresentation claim, a plaintiff must establish by a preponderance of the evidence that

"(1) [the] defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in [justifiable] reliance on the truth of the representation . . ., (7) the representation was a proximate cause of [the] plaintiff's damages, and (8) the amount of damages."

Spreitzer v. Hawkeye State Bank, 779 N.W.2d 726, 735 (Iowa 2009) (alterations in original) (quoting Givson v. ITT Hartford Ins. Co., 621 N.W.2d 388, 400 (Iowa 2001)).

Lakeside focuses particularly on Producers' specific representations that Lakeside "would be paid" when more hogs were sold or Gayer sent additional money. Plainly, Lakeside argues that hogs *were* later sold by Lakeside, yet Lakeside was not paid. Lakeside further claims that at the time Producers made these representations, it *knew* (or at least a jury could infer that Producers knew) that Gayer would be unable to "come back" into compliance with the Hog Program, and that the eventual sale of the hogs would fail to generate enough revenue to fully satisfy debts owed to all parties.

There is no support for the argument that Producers' representations amounted to statements that Lakeside would be paid first, or even paid in full.[3]  Lakeside's

---

[3]This is the logical way to understand Lakeside's claims, as Producers did continue to send many payments to Lakeside throughout 2008; just not enough to pay Lakeside in full.

president testified about Lakeside's *belief* that "when [Producers] got paid for the pigs, then [Lakeside] would get paid" and on multiple occasions Lakeside represents that the statement at issue from Producers is a statement that Lakeside "would be paid." However, that Lakeside "would be paid" is not the sum of what Producers represented, nor does it accurately reflect Producers' verbatim representations. Giving Lakeside's interpretation of Producers' representations significance beyond what Producers plainly stated is not supported by this record.

The faxes from Producers to Lakeside reviewing the outstanding bills state "[w]e are at our . . . lending limits until we receive money from Tracy or sell more hogs," "[w]e are expecting more money from Tracy so that we are able to pay more feedbills," and we "might be able to send more money next week." Gleaning more meaning from these statements is a futile exercise. Producers did not say it would pay in full, and there is nothing in the record to support the contention that these statements were false when made–that Producers meant anything other than what was plainly stated. Spreitzer, 779 N.W.2d at 735 ("Under the law, a representation must be false at the time it was made to support a claim of fraud, and a representation that was true cannot serve as a basis for a claim of fraud.") Indeed, throughout 2008, Producers *did* pay Lakeside significant sums of money toward the outstanding balance owed. And, despite Lakeside's contrary argument, Producers' statements are not ambiguous or subject to alternative interpretations sufficient to keep a fraud claim viable beyond summary judgment. Id. at 735-36 (holding that if a representation is capable of two interpretations, one of which the maker knows to be false and the other true, it can serve as a basis for fraud if it is *also* made with the intention that it be understood in the sense in which it is false).

Likewise, assuming Producers made a false representation, Lakeside is unable to establish that Producers knew any such representation was false–i.e., that it knew that Lakeside would not be paid when it received more money from Gayer or more hogs sold. That Producers had concerns about Gayer's continued ability to advance

funds at the time these outstanding bills mounted does not in any way detract from the face value of the representations at issue. Even the later e-mail in August 2008 highlighted by Lakeside wherein Producers acknowledges that after the sale of the pigs "Producers should get paid in full however, there will be outstanding feed bills owed to [Lakeside]," is of no accord as to the alleged falsity of the representations at issue. Producers previously represented to Lakeside that it would send more money, which it did. At the time Producers made the representations discussed above, there is no evidence supporting Producers' knowledge of their falsity.

As further evidence that Producers had knowledge of the falsity of its alleged representations, Lakeside argues that since Producers was "certainly aware 2008 was one of the worst hog marketing periods in history," it "could not realistically have had an expectation . . . that future sales of . . . [p]igs would generate sufficient proceeds to allow *both* Lakeside and Producers to be paid in full." However, claiming that Producers "should have known" does not pass muster. There is no record evidence that Producers ever represented to Lakeside that it would be paid in full. And, turned on its head, this argument could be fatal to Lakeside when viewed in the context of an analysis of the sixth element of its fraud claim–that it acted in justifiable reliance on the truth of the representation. Under that same logic, Lakeside should likewise have been aware of the very same market, which could belie a claim that Lakeside was justified in relying upon any alleged representations. Id. at 737 ("[T]he [justifiable-reliance] standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance element has been met.") In fact, given Producers' qualifications on each of its wire transfers during the time frame at issue, one could conclude that Lakeside continued to extend credit in the face of its own knowledge that it may not be paid in full, which belies any justification for Lakeside's alleged reliance. But, again, we need not decide this issue because at the outset, Lakeside is unable to establish that Producers made any false representations.

We affirm the district court's grant of summary judgment in favor of Producers on Lakeside's fraudulent misrepresentation claim.

### C.    Fraudulent Nondisclosure

Lakeside also claims that even assuming Producers made no false representations, there was a time at which Producers knew Lakeside would be left with outstanding bills and Producers failed to inform Lakeside of this circumstance. This claim is encompassed by the law of fraud. "A representation need not be an affirmative misstatement; the concealment of or failure to disclose a material fact can constitute fraud." Clark v. McDaniel, 546 N.W.2d 590, 592 (Iowa 1996). "However, for concealment to be actionable, the representation must 'relate to a material matter known to the party . . . which *it is his legal duty to communicate* to the other . . . party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances.'" Id. (first alteration in original) (emphasis added) (quoting Sinnard v. Roach, 414 N.W.2d 100, 105 (Iowa 1987)). Lakeside did not expressly include a claim for fraudulent nondisclosure in its amended complaint. Yet, to the extent this claim is encompassed by the law of fraud and the fraudulent misrepresentation claim that was pled, we address the district court's analysis on this issue.

"There is no specific test for determining when a duty to reveal arises in fraud cases." Id. A duty can arise in various circumstances. In Iowa, in accordance with the Restatement (Second) of Torts § 551(2), courts have "recognized a duty to disclose in situations where the plaintiff and the defendant were involved in some type of business transaction, such as buyer/seller or owner/contractor." Wright v. Brooke Grp. Ltd., 652 N.W.2d 159, 174 (Iowa 2002). This prevents "one with superior knowledge, dealing with inexperienced persons who rely on him or her, [from] purposely suppress[ing] the truth respecting a material fact involved in the transaction." Kunkle Water & Elec., Inc. v. City of Prescott, 347 N.W.2d 648, 653

(Iowa 1984). A duty to disclose might also arise from the "attendant circumstances," such as "contrivance intended to exclude suspicion and prevent inquiry." Wright, 652 N.W.2d at 175 (quotations omitted). Or, a duty to disclose occurs when a party acquires information "'that he knows will make untrue or misleading a previous representation that when made was true or believed to be so.'" Id. (quoting Restatement (Second) of Torts § 551(2)(c)).

The district court held that Producers owed no duty to Lakeside relating to Lakeside's claim of fraudulent nondisclosure because Lakeside and Producers were not involved in a business transaction together. Lakeside responds that during the course of dealing, Producers' representatives had about 50 or more conversations and more than 30 communications in writing with Lakeside, Producers paid the feed bills for the pigs in the Hog Program, requested timely reports and updates from Lakeside, and otherwise conducted itself as if it owned the hogs at issue, all of which, according to Lakeside, demonstrates a business transaction that triggers a duty on the part of Producers. The sum of Lakeside's argument is that because the two businesses were engaged in a "business transaction," Producers had a duty to disclose.

We agree with the district court's analysis regarding any alleged fraudulent nondisclosure on the part of Producers. Were we to determine that any alleged nondisclosure was material,[4] Producers was under no legal duty to disclose such

_____

[4]In its brief, Lakeside offers no explanation as to *why* it was important for Lakeside to know how Producers intended to apply the proceeds of the hogs sales–i.e., why such information was material. We surmise that Lakeside might argue that had Lakeside been told outright that, in fact, it would not be paid in full for the services it was already extending on credit, it would have taken steps to better secure its interest in the services rendered. But, in many ways, the "writing was already on the wall" so-to-speak as the outstanding bills mounted and Producers clearly claimed it had limitations on its continued payments to Lakeside. It is unclear why Lakeside had not already taken such steps that were available to protect its interest. In the end, though, any determination regarding materiality is inconsequential because this

-11-

information.[5] Despite Lakeside's argument, its dealings with Producers were not the sort of business transaction contemplated by the fraudulent nondisclosure jurisprudence. Producers had no obligation to inform Lakeside how it applied the proceeds under the Hog Program. Lakeside is unable to establish that it somehow was inexperienced or relied upon Producers to guide Lakeside and help it make prudent business decisions regarding Lakeside's business practice of extending credit or securing such extensions. That these two veteran hog feeding outfits merely did "business" together is not enough to support this claim. See id. at 174 (compiling Iowa cases recognizing a duty to disclose in situations where the parties were engaged in some type of "business transaction," each where one party had superior knowledge and expertise of some kind such as a buyer and seller dealing on a used vehicle or hotel, or a situation where the defendant contracted to repair plaintiff's water system). Additionally, even assuming that Producers later *knew* that indeed it "would not pay" all of the outstanding bills, this "subsequently acquired information" did not make untrue or misleading its previous representation that it would pay when it received money from Gayer or more hogs were sold. See id. at 175. Stated earlier, Producers *did* pay Lakeside throughout the fall of 2008, just not in full.

Both parties expend an excessive amount of time briefing and arguing about whether Producers was an "owner" of the pigs at issue. Lakeside adamantly claims that Producers owned the pigs. In support of this claim, Lakeside references Noethe's

situation does not fall within one of the circumstances creating liability for nondisclosure.

[5]Here again, Lakeside highlights the August 2008 e-mail wherein Producers speculated that after the sale of the pigs, "Producers should get paid in full however, there will be outstanding feed bills owed to [Lakeside]." For purposes of the instant analysis only, we assume that this e-mail contained something more than speculation and that Producers in fact *knew* at some discrete time that Lakeside's bills would not be paid.

stated belief that Producers acted like an owner of the pigs at all times, and further points to the terms of the Hog Program between Producers and Gayer wherein it repeatedly refers to Producers as "Owner." The Hog Program also contains a clause stating:

> On the occurrence of any Event of Default, Owner [(Producers)] shall have, in addition to its rights and remedies at law and in equity . . . [t]he right to feed and care for the Livestock. All costs and expenses of feeding and caring for the Livestock may be offset against any amounts due to Feeder pursuant to Section 8 herein.

The terms of the Hog Program, argues Lakeside, establish that as of June 2008, when Gayer failed to perform under the Hog Program, Producers assumed responsibility for the feed and care of the pigs and was thus wholly liable (Lakeside claims "legally responsible") for all of Lakeside's outstanding unpaid feed bills. Producers just as adamantly claims that at all times its role was that of lender, pointing out that the Hog Program clearly establishes the same, making very clear at the bottom of each page that, "[Producers] is the owner for security purposes only; and does not share in any of the losses or profits; and entitled to recover their cost from the hog proceeds." Each brief is carefully drafted to support the respective, competing claims: Lakeside repeatedly refers to the livestock at issue as "Producers Pigs," for example, and Producers takes pains to discuss the credit extended by Lakeside to Gayer, alone, and refers to the livestock as "Gayer's hogs."

The extent of the focus on, and discussion of, Producers' ownership status frankly eludes this court. Indeed, Lakeside repeatedly acknowledges that "Lakeside is not *required* to prove Producers owned the . . . pigs in order to recover under any of its claims for relief." Lakeside argues in its brief that it discusses Producers' ownership status in an attempt to establish the elements of duty, justified reliance, or

-13-

other elements of the tort claims raised by Lakeside in this action.[6]  In that context, this evidence is certainly relevant and informs our analysis, but only to a certain degree.  We tread carefully and review this evidence only as necessary for each of the tort claim analyses, however, because relying upon the terms of the Producers/Gayer Hog Program to establish blanket liability comes very close to an attempt to raise a contract claim based, possibly, on the theory that Lakeside is a third-party beneficiary to the contract between Producers and Gayer, or the like–a route not chosen by Lakeside in this litigation.  There are no contract claims before the court, and we will not indulge any attempt to couch a contract claim as a tort claim.  That said, we review the evidence of Producers' alleged ownership status in the light we deem necessary for the correct analysis.

Lakeside reasons that because Producers was allegedly "legally responsible" to Lakeside in June 2008 under the terms of the Hog Program for all of Lakeside's remaining unpaid bills, the district court's grant of summary judgment should be reversed.  Yet, it does not necessarily follow that Producers' alleged liability as owner, alone, results in reversal of the district court's order.  In the end, an issue of fact regarding Producers' ownership status is of no consequence.  Even viewing these facts in the light most favorable to Lakeside, Producers still prevails.  Despite any alleged ownership status, Producers was under no legal obligation to disclose information to Lakeside, because, as discussed above, the dealings between the two entities was not the sort contemplated by fraudulent nondisclosure jurisprudence.  When there is no duty,

> one party to a business transaction is not liable to the other for harm caused by his failure to disclose to the other facts of which he knows the other is ignorant and which he further knows the other, if he knew of

---

[6]Although also relevant to the fraudulent misrepresentation tort claim, we did not discuss Producers' duty in our analysis, as we disposed of that claim on other grounds.

them, would regard as material in determining his course of action in the transaction in question.

Restatement (Second) of Torts § 551 cmt. a. We therefore affirm the district court's grant of summary judgment in favor of Producers on Lakeside's fraudulent nondisclosure claim.

### D. Lakeside's Expert's Opinion

In opposition to Producers' motion for summary judgment, Lakeside submitted the testimony of a banking and forensic accounting expert opining as to whether Producers' conduct was consistent with that of an owner and not merely a lender. The district court held that because the issue before the court was whether Producers owed a legal duty to Lakeside, and Lakeside argued that Producers' ownership status informed that decision, the expert more or less offered a legal conclusion based upon facts submitted to the expert by Lakeside regarding the owner/lender status of Producers and that, as such, the court need not consider it as binding. In re Acceptance Ins. Cos. Sec. Litig., 423 F.3d 899, 905 (8th Cir. 2005) ("When the expert opinions are little more than legal conclusions, a district court should not be held to have abused its discretion by excluding such statements."). Lakeside argues that its expert provided testimony that was more technical in nature, applying extensive banking and forensic accounting experience to give industry-specific context to financial data and the actions of Producers, and that the expert could opine on the well-recognized meaning of the Producer/Gayer transaction in the business or industry. Nucor Corp. v. Neb. Pub. Power Dist., 891 F.2d 1343, 1350 (8th Cir. 1989) ("Courts have frequently recognized the value of expert testimony defining terms of a technical nature and testifying as to whether such terms have acquired a well-recognized meaning in the business or industry.").

We review for abuse of discretion the district court's decision to exclude expert testimony for purposes of determining whether there exists an issue of material fact. In re Baycol Prods. Litig., 596 F. 3d 884, 889 (8th Cir. 2010). The district court did not abuse its discretion in excluding this testimony. Contrary to Nucor, the case primarily relied upon by Lakeside, whether or not Producers functioned as owner or lender was not "ambiguous in the sense that [it was] of a sufficiently technical nature to be the subject of expert testimony." Nucor, 891 F.2d at 1350. In Nucor, the court allowed expert testimony to inform the jury of differing views regarding the statutory terminology contained in the contract at issue–i.e., in order to determine whether a breach of contract occurred, the jury had to determine whether particular rates were "fair, reasonable, and nondiscriminatory," as those terms were contemplated by their regulatory function. Id.

Here, expert testimony regarding the ownership status, or not, of Producers was not necessary to assist the trier of fact in its determination regarding the elements of the tort claims raised in this action. Federal Rule of Evidence 702 permits expert testimony to assist the jury in understanding technical or scientific evidence, which the court, in its broad discretion, determined was not necessary in this case. See Fed. R. Evid. 702. Lakeside claims this testimony was relevant to whether Lakeside justifiably relied on Producers' representations and further gives some factual context to the question of Producers' duty to Lakeside. While true, expert testimony was not needed to inform the district court on those legal issues and, as noted earlier, whether or not Producers owned the livestock is ultimately a non sequitur. Therefore, the district court did not abuse its discretion in excluding the expert testimony at issue.

E.    **Negligent Misrepresentation**

Negligent misrepresentation occurs when:

"[o]ne who, in the course of his business . . . or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

Sturm v. Peoples Trust & Savs. Bank, 713 N.W.2d 1, 5 (Iowa 2006) (quoting Restatement (Second) of Torts § 552). When determining whether the tort of negligent misrepresentation imposes a duty of care in a particular case, Iowa courts distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial. Sain v. Cedar Rapids Cmty. Sch. Dist., 626 N.W.2d 115, 124 (Iowa 2001). It is for this reason the district court granted summary judgment in favor of Producers on Lakeside's negligent misrepresentation claim. The district court held that Producers was not in the business of supplying information to Lakeside but rather the two conducted themselves at arm's length.

While correct, there is an additional aspect of the claim that creates an obstacle for Lakeside. "'[T]he tort does not apply when a defendant directly provides information to a plaintiff in the course of a transaction between the two parties, which information harms the plaintiff in the transaction with the defendant.'" Sturm, 713 N.W.2d at 5 (quoting Sain, 626 N.W.2d at 126). Stated differently,

the supplied 'for the guidance of others in their business transactions' requirement recognizes that the tort predominantly applies to situations where the information supplied harmed the plaintiff in its relations with third parties, as opposed to harm to a plaintiff in its relations with the provider of the information.

-17-

Sain, 626 N.W.2d at 126.  Limiting the application of the tort to this situation is compatible with the approach that there is no duty imposed on parties who deal at arm's length.  Id.

Lakeside argues that Producers is in the business of supplying information and thus owed Lakeside a duty of care.  In doing so Lakeside notes Producers' direct communications with Lakeside and argues that the agreement between Producers and Gayer even contemplates a service fee for Producers' supply of information to others.  But Lakeside misses the mark here.  Because Producers was not in the business or profession of supplying information or guidance to others as contemplated by the Iowa jurisprudence in this area, the claimed harm is solely to Lakeside as a result of its dealings with Producers, which is a different way of articulating that Producers and Lakeside dealt at arm's length.  Lakeside is unable to maintain its claim for negligent misrepresentation.  Accordingly, we affirm the district court's grant of summary judgment in favor of Producers on this issue.

## F.     Unjust Enrichment

"Unjust enrichment is a doctrine that 'evolved from the most basic legal concept of preventing injustice.'"  In re Estate of Roethler, 801 N.W.2d 833, 845 (Iowa 2011) (quoting State ex rel. Palmer v. Unisys Corp., 637 N.W.2d 142, 149 (Iowa 2001)).  "The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another or receive property or benefits without paying just compensation."  Palmer, 637 N.W.2d at 154.  To recover for unjust enrichment, Lakeside must show: "(1) [Producers] was enriched by the receipt of a benefit; (2) the enrichment was at the expense of [Lakeside]; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances."  Id. at 154-55.

The district court held that while both parties agree that Producers received a benefit in part because Lakeside provided feed and other services for the livestock, there is no evidence that Producers was enriched at the *expense* of Lakeside nor is it unjust to allow Producers to retain the benefit under these circumstances. We agree, although in resolving this matter we need not go so far as to determine Producers' status as owner/lender, nor do we need to determine Producers' priority for secured interest purposes.[7]

Producers did not receive anything to which it was not entitled to receive under its contract with Gayer. Lakeside makes claims that Producers "force[d] Lakeside to perform *future* care, feeding and general labor" and that Producers "induced Lakeside to incur the costs and perform the work required to *generate* the sale of proceeds," apparently through Producers' own representations. Yet these allegations are baseless and unsupported by the record. Having previously determined that Producers made no false representations to Lakeside, it follows that Lakeside was on equal footing throughout these dealings and interactions and there is no evidence of the sort of coercion to which Lakeside now alludes. Producers did not "reap profits" "without making good on its representation to reimburse Lakeside," as Lakeside claims. We previously discussed at length that Producers did in fact continue to pay Lakeside as it represented.

We do not attempt to surmise as to why Lakeside failed to take steps to legally protect its interest by way of a lien[8] or at the very least a contract, but ultimately it is

---

[7]Despite the district court's determination that Producers had a "superior legal right" in this case, Producers readily acknowledged at oral argument that were it to face a timely perfected lien from a valid lienholder (unlike Lakeside), armed with the filings contained in the record, Producers could have a tough fight. But, that discussion is for another day, as there are no such challenges at play.

[8]Iowa Code Ann. §§ 570A-570A.6.

-19-

these failings that paved the way for the instant circumstance. It is not unjust to allow Producers to retain the benefit in these particular happenings when a shortfall existed, as it is not inequitable to allow a contracting party the right to fulfillment of contractual obligations, which in this case includes the payment of fees contemplated by the Hog Program.

## III.  CONCLUSION

For the reasons stated herein, we affirm the district court's grant of summary judgment in favor of Producers.

_____