# United States Court of Appeals
### For the Eighth Circuit

_____

No. 12-3515
_____

Amana Society, Inc.; Amana Farms, Inc.

*Plaintiffs - Appellants*

v.

GHD, Inc.

*Defendant*

Excel Engineering, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: December 17, 2013
Filed: July 11, 2014
[Published]

_____

Before BYE, BRIGHT, and SMITH, Circuit Judges.

_____

PER CURIAM.

Amana Society, Inc. and its wholly-owned subsidiary Amana Farms, Inc. (collectively, "Amana") seek reversal of the district court's[1] grant of summary judgment to Excel Engineering, Inc. ("Excel"). The court concluded that Amana failed to establish that Excel breached a duty of care to Amana in a design- certification letter that it supplied to the firm that Amana hired to construct an anaerobic digester. Alternatively, the court found that Amana did not actually rely on Excel's letter. We affirm the judgment of the district court.

## I. *Background*

Amana operates a cattle farm in Iowa, with John McGrath as the farm manager. In early 2006, McGrath considered using an anaerobic digester to dispose of manure on the farm. An anaerobic digester consists primarily of a large concrete box to contain waste material, referred to as "substrate." Bacteria break down the substrate and convert it into methane gas. The digester collects the gas, which is used to produce electricity. In February 2006, Jim Johnson—another Amana employee—contacted GHD, Inc. (GHD), a corporation specializing in the design and construction of anaerobic digesters, to discuss the feasibility of installing a digester on Amana's farm.

Amana initially hoped that its farm's manure would supply sufficient substrate for the digester. However, concerns arose that the farm's manure would not be enough. GHD told Amana to locate off-farm organic waste "like cheese whey, papermill sludge, [or] packing-house waste" for use as additional substrate. Consequently, Amana explored the use of paper sludge in combination with manure. In March 2006, Amana informed GHD that it had secured paper sludge from a nearby paper mill. GHD calculated that a digester would be economically feasible based on the availability of 1,000 cubic feet of manure and 250 tons of paper sludge per day.

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

GHD also informed Amana that Amana might be eligible for a $500,000 grant from the United States Department of Agriculture (USDA) for its digester project. GHD and Amana agreed that GHD would prepare a grant application based on the "general GHD digester design." GHD prepared the application, but Amana was responsible for determining which substrates it would use in the digester.

USDA regulations require the grant application to include a technical report to "[p]rovide authoritative evidence that the system will be designed and engineered so as to meet its intended purpose." 7 C.F.R. § 4280, subpt. B, app. B, § 2(d). For projects, such as this digester, with total costs exceeding $1,200,000, USDA regulations require that "an independent qualified consultant" review the technical report and provide an opinion and recommendation. 7 C.F.R. § 4280.116(b)(7)(ii)(D).

GHD employed Excel to act as the independent consultant for the grant application. Amana did not contract with Excel. In May 2006, GHD supplied the technical report to Excel engineer James Todd. The technical report stated that manure and 250 tons of paper sludge would be added to the digester daily. The report anticipated the digester would produce 2,600 kilowatt-hours of electricity on a continuous basis.

Todd, on Excel's behalf, composed a certification letter and performed the independent review that the USDA grant application process required. The parties dispute the quality of that review. According to Excel, Todd confirmed the quantities of inputs and checked the calculations. In the letter, Todd indicated that he reviewed the technical report and stated that the technical requirements were "adequate and appropriate for a project of this size and complexity." He also stated that "the technical description, as stated, should satisfy the technical requirements of the Amana Society for interconnection of a generating facility." Finally, the letter stated that "the generated power and projected costs are consistent with other projects of this scope and complexity."

The technical report states that "[t]he proposed generated power and projected costs are consistent with other projects of this scope and complexity. [Todd] was independently able to confirm that the GHD[-]projected outputs seemed reasonable and achievable. Therefore [Todd] finds that this is a technically viable project design for [Amana]." GHD included the technical report and certification letter with the grant application. Amana signed the application and submitted it to the USDA.

Despite not having contracted with Excel for its services, Amana contends that it relied on Excel's statements in the certification letter and technical report in deciding whether to submit the application. Amana did conduct its own due diligence by hiring Alliant Energy ("Alliant") to perform an independent analysis and conduct a feasibility study. The Alliant feasibility study contemplated a combination of manure, paper sludge, and whey permeate from a local cottage cheese manufacturer. Amana hired an independent laboratory to verify composition of the substrates and to verify whether the added paper sludge would produce the amount of gas that GHD projected for its proposed power generation.

Amana pursued a five-year contract with a local paper mill for paper sludge. The mill would not enter into a five-year contract but did supply as much sludge as Amana requested. Seeking an alternative, Amana secured a five-year agreement from Genecor, Inc. for a substrate substitute for paper sludge that the parties refer to as a "Genecor product." After securing the new substrate, Amana asked GHD to increase the size of the proposed digester by 20 percent to accommodate new substrates.

In early 2008, the USDA awarded the grant, and GHD completed construction and installation of the digester. Amana initially utilized a mixture of 70 percent Genecor product, 20 percent manure, and 10 percent paper sludge. In May 2008, Amana applied for a grant from the Iowa Power Fund. In its pre-application, Amana described the digester as "designed to use 10,700 cubic feet of waste a day." Of that,

2,200 cubic feet would be manure, and the remaining 8,500 cubic feet would "be food processing by-product from regional processors."

Unfortunately, the digester never worked as planned. According to Amana, it was never able to put much Genecor product into the digester, and Amana ultimately stopped using Genecor product within the first six to eight months. Even after discontinuing use of the Genecor product, Amana states that it was unable to input the originally proposed amount of paper sludge into the machine, topping out around 10–15 percent of the original amount. Eventually, the digester could only consistently produce approximately half its originally projected power output.

Amana sued both GHD and Excel in the same action, but it ultimately settled with GHD. Following the settlement with GHD, Amana had two claims pending against Excel: Counts V and VI of the complaint. Count V alleged that Excel made a negligent misrepresentation in the technical report, namely the representation that the "projected outputs seemed reasonable and achievable." Count VI alleged professional negligence on the same basis. Excel moved for summary judgment on both counts. The district court granted the motion as to Count V and denied the motion as to Count VI. The parties proceeded to trial on Count VI, resulting in a jury verdict in favor of Excel. Amana now appeals the grant of summary judgment on Count V.

The district court found that Excel owed no duty of care to Amana. The court concluded that, after reviewing the record, Excel was not "manifestly aware" that Amana would rely on Excel's certification letter to GHD in deciding whether to build a digester. As an alternative basis for granting summary judgment, the court found that Amana "could not have justifiably relied on any statements Excel made" with respect to the digester "because [Amana] elected to build a different digester than the one Excel reviewed."

II. *Discussion*

On appeal, Amana argues that the district court erred in granting summary judgment to Excel on the basis that Excel owed no duty to Amana for purposes of a negligent misrepresentation claim under Iowa law. First, Amana asserts that the district court erred in concluding that Excel was not "manifestly aware" of how Amana intended to use the information that Excel provided, improperly relying on the Todd's purported "self-serving testimony." Second, Amana contends that the district court erroneously concluded, as a matter of law, that Amana did not justifiably rely on Excel's misrepresentations in deciding to go forward with the digester project that was ultimately constructed. According to Amana, whether a party is justified in relying on another party's alleged misrepresentations is a jury question.

> We review the district court's decision to grant a motion for summary judgment de novo, viewing all evidence most favorably to, and making all reasonable inferences for the non-moving party. We will affirm the grant of summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Additionally, because this case is before the court on diversity jurisdiction, this court will apply the substantive law of the forum state, Iowa.

*Lakeside Feeders, Inc. v. Producers Livestock Mktg. Ass'n*, 666 F.3d 1099, 1105–06 (8th Cir. 2012) (internal citations, alterations, and quotations omitted). We "may affirm the district court on any basis supported by the record." *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1032 (8th Cir. 2012) (citation omitted).

We begin by addressing Amana's "justifiable reliance" argument. Iowa recognizes the tort of negligent misrepresentation and has generally adopted the tort as described in § 552 of the Restatement (Second) of Torts. *See Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111 (Iowa 2012). Subsection (1) of § 552 is the focus of the case before us, and it provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977) (emphasis added). "'Reliance upon the information is justifiable if a person acting with reasonable and ordinary prudence and caution would have a right to rely on the representations.'" *Pollman v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405, 410 (Iowa 1997) (quoting *Kaiser Agric. Chems. v. Ottumwa Prod. Credit Ass'n*, 428 N.W.2d 681, 683 (Iowa Ct. App. 1988)).

Amana cannot establish that it justifiably relied on any statements from Excel or Todd concerning the digester outputs because no relevant representations exist on which to rely. The GHD-designed digester that Amana constructed and operated in 2008 was not the digester design that Excel reviewed in 2006. As to the digester that Amana ultimately built, Excel made no representations at all. Absent a representation, there can be no reliance—justifiable or otherwise—and no *mis*representation. Amana had no "right to rely on" Excel's 2006 statements—no more than the purchaser of a pick-up truck could claim that he relied on a dealer's representations about the gas mileage or seating capacity of a sedan.

GHD designed the digester, while Amana (with some guidance from GHD) selected the substrates. GHD then prepared the technical report, utilizing its design and Amana's proposed substrates. GHD in turn submitted the specifications of the proposed digester to Excel for an opinion of its feasibility to qualify for a federal grant. After Excel completed its review, Amana used a substantially different substrate mixture and requested that GHD resize the digester. Amana states that the size and the substrate mixture are the most important features of a digester. Amana did not submit the changes to either feature to Excel for an updated review. Excel never reviewed the

final design or substrate proposal and therefore made no representations as to the feasibility of *that* design.

The district court correctly concluded that Amana could not have justifiably relied on Excel's review of the initial GHD design as a basis for liability due to the failure of a materially different design and utilization.[2]

### III. *Conclusion*

The judgment of the district court is affirmed.

_____

_____

[2]Because we agree with the district court that Amana could not have justifiably relied on any statements that Excel made, we need not address whether Excel was "manifestly aware" that Amana would rely on those statements in the first place.