# IN THE COURT OF APPEALS OF IOWA

No. 21-1465
Filed December 7, 2022

**KAREN SCHWICKERATH,**
       Plaintiff-Appellee,

**vs.**

**PATRICK RYAN ANDERSON, JULIA STACEY ANDERSON, PATRICK R. ANDERSON, ATTORNEY AT LAW, IOWA PROPERTY HOLDING, LLC, EQUITY-VESTORS, LLC, IOWA PROPERTY HOLDING CO-OP, INC., IOWA PROPERTY MANAGEMENT AND MAINTENANCE, LLC,**
       Defendants-Appellants.
_____

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.

An attorney and his business entities appeal a judgment for a former client on her claims for fraud, negligent misrepresentation, and legal malpractice. **AFFIRMED.**

Matthew M. Boles, Christopher Stewart, and Adam C. Witosky of Gribble, Boles, Stewart & Witosky Law, Des Moines, for appellants.

Shayla McCormally and Sophie Wanek of McCormally & Cosgrove, P.L.L.C., Des Moines, for appellees.

Heard by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

"A lawyer with his briefcase can steal more than a hundred men with guns." Mario Puzo, The Godfather 51 (Putnam Publishing Group 1969).

Bragging that he had a "system that should be marketed because it combines high rates of return with safety that only an attorney would think of," attorney Patrick Anderson swindled his client, Karen "Kara" Schwickerath, out of $550,000.00 in a series of five contracts. When that boast proved to be false, Schwickerath sued Anderson, his wife Julia, and his various business entities. After a three-day bench trial, the district court entered judgment in Schwickerath's favor for $755,371.06 in compensatory damages and $200,000.00 in punitive damages, plus $52,729.50 in attorney fees. Anderson and his companies appeal.[1]

## I.    Background Facts and Proceedings

Anderson and Julia moved to Iowa in 1998 from California. Anderson is licensed to practice law in both states. He also served as a pastor of a church for almost two decades. After being laid off as general counsel for a machine company in 2015, Anderson opened a solo law practice. He billed himself as experienced in "investments and estate planning" on his firm's website.

Anderson and Schwickerath met in 2016, when he went to Schwickerath's house to purchase some landscape blocks from her. The pair began chatting

---

[1] The district court dismissed all of Schwickerath's claims against Julia and declined to enter judgment against one of Anderson's companies—Iowa Property Management & Maintenance, LLC—because the parties agreed that company "own[ed] no assets and was never involved in any of the transactions involved in the dispute." So the parties to this appeal are limited to Anderson, his law practice, and his companies: Iowa Property Holding, LLC; Equity-Vestors, LLC; and Iowa Property Holding Co-Op, Inc.

about Schwickerath's house, which she was renovating. She told Anderson that after "semi-retiring" from construction, "it was kind of a dream . . . to buy an old house and renovate it." She was able to do this because her father had passed away the year before and left her $1,000,000.00. During this conversation, Schwickerath learned Anderson was an attorney and knowledgeable about real estate investments.

Armed with that knowledge, Schwickerath contacted Anderson in January 2017 for his help in closing on a rental house she had purchased. Anderson agreed to represent her, cutting his normal fee in half. In an email to her with some questions about the closing, Anderson wrote:

> I have a business question for you though: I help arrange real estate type loans and receive very high interest rates for my private lenders. Do you know of anyone interested in participating? These are highly secured and set up so that the money is easily retrieved in the event of default.

When Schwickerath expressed interest, Anderson responded: "I can give you the details on the loans when we meet. I have a system that probably should be marketed because it combines high rates of return with safety that only an attorney would think of. (Not boasting ☺)."

While coordinating that meeting, Schwickerath asked for Anderson's advice on her rental homes and whether she should create a new limited liability company for them. Anderson agreed that she should and offered to help her "with the LLC drafting and filing." Going back to his investment proposal, Anderson said in that same email: "Also, I can help you set things up so that you are not a target for suit and have more liquidity for future investment opportunities when they arise." And in response to Schwickerath's inquiries about his legal fees, Anderson told her:

"So long as we are working on investments, you are on the 'family plan' for legal fees (which means I will work for lunches)."  Over the next couple of months, Anderson directed Schwickerath to blank templates she could use to set up her new companies, drafted deeds transferring her properties into those companies, and wrote a letter to a subcontractor she was having issues with.

In the midst of these legal services, Anderson proposed his first investment opportunity to Schwickerath—a loan from her of $50,000.00 to his company, Iowa Holding Property, LLC.  He explained to her that the loan was to help a third party with bad credit buy a house.  The contract, dated February 4, 2017, was drafted by Anderson on his firm's letterhead, as were all the contracts that followed, and recited:

> Kara desires to lend Fifty Thousand ($50,000) Dollars to Iowa Property Holding LLC in order to acquire a Monroe County Iowa residence. . . .
> Kara shall hold an Interest in said residence and Iowa Property Holding LLC up to Fifty Thousand ($50,0000.) Dollars until such debt is paid in full.
> Iowa Property Holding LLC shall hold said residence for the benefit of Kara . . . .

Kara was to be paid interest at ten percent annually with monthly principal and interest payments due from Iowa Property Holding.  The bottom of the agreement stated: "Kara understands that Patrick R. Anderson is an attorney, and that he has an interest in Iowa Property Holding LLC."[2]

Schwickerath wrote a check to Iowa Property Holding for $50,000.00, which Anderson deposited into the company's bank account.  But Anderson later told

---

[2] All of the contracts that followed, except an addendum to the second one and the parties' final contract, contained this same statement.

Schwickerath the purchase did not go through because "the person he was trying to help out didn't follow his rules." Rather than returning Schwickerath's money to her, Anderson proposed a second investment, this time for twice as much.

The second contract was entered into on May 15, 2017, as an amendment to the first. In it, Schwickerath agreed to lend Iowa Property Holding an additional $110,000.00 "in order to own and operate and or renovate real property in Waterloo, Iowa," specifically apartment buildings on Langley Road. The contract provided that Schwickerath would hold an interest in Iowa Property Holding up to $160,000.00 until the debt was satisfied. She was to again receive ten percent interest annually but with interest only payments of $1,333.34 each month and a balloon payment due in three years. On the same day, the parties entered into an addendum to the second contract, which provided that Schwickerath would receive an $8100.00 "appreciation bonus."

Schwickerath paid Anderson $110,000.00 in three separate checks. Those checks were made out to Anderson personally but again deposited into his Iowa Property Holding account. Schwickerath didn't "know at that point in time if [Anderson] owned" the Waterloo property already, although she "assumed he did." But she said Anderson "always" told her in their conversations that she "was secured." She didn't think there was much risk of losing her money because Anderson "is an attorney. He specializes in estate planning and investments, and he'd been in investments all his life as far as building homes and stuff, so he knew what he was doing."

Following these three contracts, Schwickerath asked Anderson to send her his tax returns. He instead gave her a document titled, "Patrick Anderson Assets

and Liabilities Schedule Revised July 2017." In this document, which Anderson walked through with Schwickerath, he represented that he had $348,000.00 due in fees for his law firm. He also listed three apartment buildings as assets—the Langley Road apartments in Waterloo, which he valued at $2,400,000.00, against which a debt of $1,920,000.00 was owed; and two buildings in Nevada, valued together at $1,775,000.00, against which debts of $1,082,000.00 were owed. There was no indication from this document that the apartment buildings Anderson listed as assets were owned by anyone other than him or Iowa Property Holding.

Schwickerath was reassured her money was safe after seeing Anderson's statement of assets and liabilities. Around the same time, she also began receiving $1333.34 in monthly payments from Anderson on the second contract. So when Anderson proposed a third investment opportunity to Schwickerath in August 2017, she said yes.

Unlike the first two, this one was for a start-up business called "Blade Pros"—a traveling scissor-sharpening operation for hairdressers and barbers. In a proposal for the business, Anderson explained that Nicholas Milhous, the son "of a long time friend and client," came up with the idea, which Anderson determined was "a very interesting business worth pursuing" after doing his "own research on the market and equipment and marketing." He told Schwickerath that "because this is a new business start up, I will guarantee the loan against my Nevada Apartments. That way, no matter what happens with the business, your funds are secure." He proposed that Schwickerath loan $140,000.00 to Iowa Property Holding "at 20% interest" over a six-month period, with the loan "to be repaid after two years." In an email preceding the proposal, Anderson told Schwickerath: "The

way I'm protecting you (my client) is I'm guaranteeing repayment through my apartments. In other words, if they belly flop for any reason, when I refi my buildings, you are repaid with interest."

The contract for this investment, dated August 17, 2017, reflected Anderson's proposal, except that Schwickerath was given "an interest in Iowa Property Holding LLC up to" $140,000.00 rather than a specific interest in the Nevada apartments. Holding up her end of the deal, Schwickerath gave Anderson checks between September 2017 and March 2018 that totaled the $140,000.00 she agreed to lend. Those checks were again made out to Anderson or Iowa Property Holding and deposited into the Iowa Property Holding account. The business, however, never turned a profit. Its brainchild, Milhous, testified Blade Pros did not have a physical location, business plan, budget, books, employees, vehicles, or equipment beyond a scissor-sharpening machine. For ten months, Milhous said he traveled to some salons and "sharpened a few" scissors. Yet each month, he received about $4000.00–$5000.00 from Anderson, mostly in cash. When Schwickerath asked Anderson in October 2017 "how the scissor business is working," he told her: "They have been to over 69 salons so far and have scheduled many appointments as well as sharpened lots of scissors."

Soon after Schwickerath's last payment on the Blade Pros contract in March 2018, Anderson made his final investment pitch to her. He told Schwickerath that he wanted to convert some of his apartment buildings into condos. In a contract dated April 19, 2018, and labeled as an addendum to the prior contracts, Schwickerath agreed to lend "an additional Three Hundred Thousand ($300,000) Dollars to Iowa Property Holding, LLC (Borrower) at 10% interest only, with a

bonus to be paid out according to the terms of the agreement dated 5/15/17." The contract provided:

> In order to further protect the interests of the lender, borrower shall grant to lender an interest in the accounts receivables, that is the rental income, from the properties held by the following companies: Iowa Property Holding Co-op, Inc, and Equity-Vestors, LLC. In the event of default by borrower, lender shall have the right to attach her interest in said accounts receivables in order to continue to receive her interest payments.

Before this contract, Schwickerath had never heard of Iowa Property Holding Co-Op, Inc. or Equity-Vestors, LLC. She thought that all of the apartment buildings were owned by "Patrick and Julia, the Iowa Property Holding." Schwickerath testified that she "never noticed the difference" between Iowa Property Holding, LLC and Iowa Property Holding Co-Op, Inc. when she looked at the agreement. Turns out, none of the apartment buildings were owned by Iowa Property Holding, which Anderson later described as just a "utility LLC" with no assets. When he purchased the Waterloo apartments, Anderson put them in the name of Equity-Vestors. And the Nevada apartments were owned by the Co-op.

Unaware that her money was supposedly secured by an interest in a company that didn't own anything, Schwickerath transferred a total of $250,000.00 to Anderson from April until November 2018, when she ran out of money. After she told Anderson that she did not have the last $50,000.00, he suggested that she "could find the money elsewhere, take out a mortgage on [her] house" or borrow money from a friend. Feeling nervous, Schwickerath reached out to the attorney who had helped settle her father's trust. That attorney had questions for Anderson about Schwickerath's investments with him, telling Schwickerath what Anderson had done "was inappropriate." Schwickerath forwarded the questions

to Anderson, and the two met in person to discuss. Anderson assured Schwickerath her investments were secure, showing her an "investment summary" that stated there was $1,934,000.00 in total equity between the Waterloo and Nevada apartment buildings, though he again failed to disclose they were not owned by Iowa Property Holding. Anderson continued to press Schwickerath for more money after that meeting, while avoiding a meeting with Schwickerath's trust attorney.

At the end of February 2019, Anderson gave Schwickerath a document labeled, "Status Report and Game Plan Proposal for Moving Forward." In that document, he proposed selling the converted condo units in Waterloo to repay her loan by March 1, 2020, with interest. The document closed with the following pitch—"Here's what I propose: I would like to borrow the last $50,000 of our agreement. Then allow interest to accrue on the principal for one year, so that the total repayment by March 1, 2020 would be $660,000." Schwickerath did not give Anderson any more money, and he stopped paying her on the contracts.

In the months that followed, Schwickerath texted and emailed Anderson but got no response. In May 2019, she emailed him that:

> I considered you a trusted friend and now I feel like I've been duped. You have not made time to meet with my attorney and myself as you said you would. This isn't in regards to a couple hundred dollars, it's hundreds of thousands! My whole life is at your mercy and it seems you have chosen to just ignore me.
> I thought, or you led me to believe, that you would do whatever is needed to secure my money.
> If you can't find time to meet with us and work this out I will have to begin some kind of legal action.

Rather than responding to this email himself, Anderson had his wife, Julia, reply. She told Schwickerath that she was "looking over [her] account" and noticed

it was "missing a waiver for independent counsel page or in lieu of that a reference of independent counsel." When Schwickerath asked what she meant, Julia replied:

> I need a release for your file that states either that you had independent counsel or that you wa[i]ved independent counsel. At the beginning of making private loans I[']m aware that you were advised to secure independent counsel but it is of course your right to waive receiving independent counsel, it's like a second opinion, is that more clear?

Schwickerath testified that Anderson never mentioned independent counsel, or a potential conflict of interest, throughout their five contracts. It was not until their lending relationship was unraveling, after Schwickerath had entered into all of the contracts, that Anderson told her: "Looking back, I was supposed to stop everything until you had the deal reviewed by independent counsel—that was my mistake. I could lose my license for that mistake." In that same document, Anderson said that while he did not fault her trust attorney for asking questions, "most lawyers are deal killers and not deal makers."

When Schwickerath responded to Julia's email that she would not be waiving counsel, Julia made one last attempt to stave off legal action, proposing:

> Here is my proposal to secure your loan.
> I will refinance or sell one of my other properties and use that money to pay down the mortgage of another property that is enough value to be equal to your loan with plenty of room for equity, I will then place your loan against that property and put that property in your name thereby making you owner and boosting your net value and securing your money with real property. . . .

Schwickerath, however, already believed her investments *were* secured by her interest in Iowa Property Holding.

In reality, Iowa Property Holding was a catch-all business for Anderson's real estate ventures and law practice. The only asset in Iowa Property Holding's name seemed to be the bank account where Anderson deposited Schwickerath's money. Money from his law practice also went into that account, along with occasional rent from tenants at the Waterloo and Nevada apartment buildings. From there, Anderson funneled money to his other companies—the Co-op and Equity Vestors—which were the true owners of the apartments Schwickerath purportedly helped finance. Anderson did not segregate Schwickerath's money in that account, which he and Julia used to pay for personal expenses like cruises, jewelry, skin care, clothes, and gym memberships for their family, along with expenses for Anderson's law firm.

On May 8, 2020, Schwickerath filed a petition against Anderson, his law practice, Iowa Property Holding, the Co-op, and Equity-Vestors for breach of contract, breach of oral promises, promissory estoppel, fraud, negligent misrepresentation, conversion, and legal malpractice. The next year, she added a claim to pierce the corporate veil. Anderson denied Schwickerath's claims and raised defenses of failure to mitigate and off-set.

A bench trial was held in May 2021. In September, the district court entered judgment in Schwickerath's favor for $755,371.06 in compensatory damages and $200,000.00 in punitive damages. The court dismissed Schwickerath's conversion claim but found she proved her claims for breach of contract, breach of oral promises, and promissory estoppel against Anderson, Iowa Property Holding, Equity-Vestors, and the Co-Op. The court found the same defendants, plus Anderson's law practice, were also liable on Schwickerath's fraud claim, while just

Anderson and his law practice were liable for the negligent misrepresentation and legal malpractice claims. Finally, the court granted Schwickerath's request for common law attorney fees and directed her to "submit an application for attorney fees and costs." A later ruling, entered after the notice of appeal was filed, set those fees at $52,729.50.

On appeal, Anderson and his various business entities (collectively Anderson) claim the district court erred in finding Schwickerath proved her claims for fraud, negligent misrepresentation, and legal malpractice. Anderson also challenges the court's awards of compensatory damages, punitive damages, and attorney fees.

## II. Standards of Review

We review the district court's ruling on Schwickerath's fraud, negligent misrepresentation, and legal malpractice claims for the correction of errors at law. *Chrysler Fin. Co. v. Bergstrom*, 703 N.W.2d 415, 418 (Iowa 2005). The court's findings of fact are binding on us if supported by substantial evidence. *Id.*

We also review an award of punitive damages for the correction of errors at law, though our review of the excessiveness of those damages is de novo. *Wolf v. Wolf*, 690 N.W.2d 887, 893–94 (Iowa 2005). Our review of an award of common-law attorney fees is de novo. *Id.* at 887.

## III. Analysis

### A. Fraudulent Misrepresentation

Anderson claims the initial question for this court "is whether a merit ruling should have been reached" on Schwickerath's fraud claim. Quoting *Whalen v. Connelly*, he argues that "[w]hen a person with knowledge of a potential fraud

enters into a new agreement concerning the same subject matter, he waives his claim to fraud in the original transaction." 545 N.W.2d 284, 294 (Iowa 1996) (citing 37 C.J.S. *Fraud* § 69 (1943)). In support of this argument, he cites Schwickerath's testimony at trial that she knew Iowa Property Holding owned nothing when she signed the contracts and points to the reference in the last contract to the Co-Op and Equity-Vestors. But this waiver claim was neither raised in nor decided by the district court, so we find that error was not preserved. *See Est. of Cawiezell v. Coronelli*, 958 N.W.2d 842, 848 (Iowa 2021) ("In order for error to be preserved, the issue must be both raised and decided by the district court." (citation omitted)); *Top of Iowa Co-op v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) (noting we can consider whether error was preserved "despite the opposing party's omission in not raising the issue at trial or on appeal").

Anderson next argues that he "made no material misrepresentations on which [Schwickerath] could justifiably rely." *See Cornell v. Wunschel*, 408 N.W.2d 369, 374 (Iowa 1987) (setting out the elements for a fraudulent misrepresentation claim). The district court found otherwise, ruling:

> [T]here is no question Anderson personally and on behalf of his corporate entities made intentional misrepresentations to Schwickerath regarding the purpose of the money she was lending to him. He misrepresented which entities owned the property she was investing in, and he misrepresented the financial viability of himself and his corporate entities. He purposefully engaged in these misrepresentations to deceive Schwickerath by having her believe these investments were default proof.

Upon viewing the evidence in the light most favorable to the district court's judgment, we conclude these findings are supported by substantial evidence. *See Chrysler*, 703 N.W.2d at 418.

Starting with Anderson's misrepresentations, he focuses on those related to the purpose of the contracts and his assets. As to the former, Anderson argues there was no misrepresentation because Schwickerath's funds were used as set out in each contract. But that's not what the record shows. All of Schwickerath's funds were deposited into the Iowa Property Holding's bank account and commingled with other money there. For instance, she paid Iowa Property Holding $50,000.00 on February 8, 2017, under the first contract. Anderson did not use that money to "acquire a Monroe County Iowa residence," as the contract stated. He instead deposited the money into Iowa Property Holding's bank account, which he then used to pay personal expenses, like music lessons for his children. Anderson did the same with each of the rest of the payments Schwickerath made, depositing them into Iowa Property Holding's bank account and using them indiscriminately from there.

As for Anderson's assets, he notes that Schwickerath did not have his asset and liabilities schedule until after she had entered into the first two contracts. But there were three more contracts that followed, with an additional $390,000.00 in payments from Schwickerath. Anderson zeroes in on the values he placed on his assets in that schedule, arguing they were statements of opinion close to actual values. That was not true, however, for Anderson's law firm fees, which the schedule listed as $348,000.00. But his 2017 tax returns listed only $14,898.00 in gross receipts for his firm. Anderson could not explain this large discrepancy at trial. And Anderson's argument also does not account for his misrepresentation about the ownership of his assets. Nowhere on that schedule does Anderson disclose that the apartment buildings, against which Schwickerath thought her debt

was secured, were owned by anyone other than himself or Iowa Property Holding. He also does not address his repeated representations that Schwickerath's money was secure, when it clearly was not.

Yet Anderson argues that Schwickerath's reliance on his representations of Iowa Property Holding's status was not justified. *See Cornell*, 408 N.W.2d at 374 (setting out the elements for a fraudulent misrepresentation claim). While Schwickerath did testify on cross-examination that she knew Iowa Property Holding "was a holding account for the money" when she entered into the contracts, she clarified on redirect:

> Q. You were asked a question about your deposition, that at the time you were entering these agreements, did you know that Iowa Property Holding, LLC—did you know if it owned anything? A. No. I thought they did but I—no.
> . . . .
> Q. . . . What did you understand at the time you entered these agreements about Iowa Property Holding? A. I thought that was his LLC that all his properties and everything were in.

She added that her testimony on cross-examination was based on her "understanding now," not what she knew at the time of the contracts. In accepting this explanation, we defer to the district court's finding that Schwickerath was more credible than Anderson. *See Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) ("The trier of fact—here, the district court—has the prerogative to determine which evidence is entitled to belief.").

Anderson is correct that the "justifiable-reliance standard does not mean a plaintiff can blindly rely on a representation." *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737 (Iowa 2009). "Instead, the standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the

transaction is considered to determine if the justifiable-reliance element has been met." *Id.* The fatal context to Anderson's claim is that he was Schwickerath's attorney when they entered into these contracts. *See id.* (considering the relationship between the parties and the existence of a fiduciary relationship). While Anderson contested that fact at trial, he concedes it on appeal. Because of that relationship, Schwickerath testified that she "believed and trusted in him." She explained: "[H]e's an attorney, and this is what he does. It's on his law site, that he does investments and estate planning. . . . He's an attorney. He's a minister. I just—I just believed him."

As Schwickerath's attorney, Anderson had a duty to disclose material facts about the investments to her, along with his own personal interests in the transactions or other potential conflicts of interest. *See Cornell*, 408 N.W.2d at 375 (stating that when an attorney-client relationship exists between the parties, "we have required the party to make a full and truthful disclosure of all material facts within that party's knowledge); *see also* Gregory C. Sisk, *Iowa Practice Series, Lawyer and Judicial Ethics* § 13:8(a) (July 2022 update) ("[A]s part of the fiduciary responsibilities of the lawyer, . . . the lawyer owes a proactive duty of candor to the client that goes well beyond not being deceptive or misleading."). Anderson failed in this most basic duty of honesty. *See Iowa Supreme Ct. Bd. of Prof. Ethics v. Clauss*, 530 N.W.2d 453, 455 (Iowa 1995) (noting the "absolute necessity for lawyers to be absolutely honest"). Viewing this evidence in the light most favorable to the district court's judgment, we conclude the court's findings on Schwickerath's fraud claim are supported by substantial evidence. *See Chrysler*, 703 N.W.2d at 418.

**B.  Negligent Misrepresentation**

For his next claim, Anderson argues that the tort of negligent misrepresentation does not apply because he provided information to Schwickerath during transactions between them.  *See Sain v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 126 (Iowa 2001) ("[T]he tort does not apply when a defendant directly provides information to a plaintiff in the course of a transaction between the two parties, which information harms the plaintiff in the transaction with the defendant.").  Again, although Schwickerath does not contest error preservation, the issue was not raised or decided by the district court.  *Cawiezell*, 958 N.W.2d at 848.  As a result, we find error was not preserved.  *Sime Farms, Inc.*, 608 N.W.2d at 470.

Anderson's remaining argument on the negligent misrepresentation claim is that "there was no false representation on which" Schwickerath could justifiably rely.  Because we laid out those false representations above, we summarily reject this argument and affirm the court's ruling on this claim.

**C.  Legal Malpractice**

Anderson next challenges the court's finding that he committed legal malpractice.  Because he now concedes that he had an attorney-client relationship with Schwickerath, Anderson only contests whether he breached a duty to her.  *See Stender v. Blessum*, 897 N.W.2d 491, 502 (Iowa 2017) (setting out the elements of a legal malpractice claim).  He argues that in finding he did breach a duty, the court erred in relying on a violation of Iowa Rule of Professional Conduct 32:1.8, which prohibits an attorney from entering into a business transaction with a client unless

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

Anderson is correct that a violation of a rule of professional conduct does not establish a per se claim of legal malpractice. *Id.* But, as the district court correctly recognized, a violation can be "used as some evidence of negligence." *Id.* The court found that Anderson

entered into business transactions with Schwickerath in which he failed to fully disclose the terms of the transactions to her. He also failed to tell Schwickerath in writing to seek independent counsel. He finally failed to obtain in writing from Schwickerath her informed consent regarding these transactions. All of these actions constitute a violation of Iowa Rule of Professional Conduct 32:1.8. These actions *further* demonstrate negligence on his part.

(Emphasis added.)

Beyond Anderson's violation of rule 32:1.8, the court found he "made fraudulent statements and omitted material facts," used Schwickerath's funds "for things outside the context of the agreements," failed to inform her about the "risks involved in these agreements," and failed to draft the contracts in her best interests. Anderson challenges these findings, arguing that the contracts he entered into with Schwickerath "were not part of any legal service" he offered to her. *See id.* at 504 ("[B]efore a violation of our rules of professional conduct can be used—even as some evidence of negligence—there must be an underlying actionable claim against the attorney arising out of how the attorney mishandled a

legal matter."). He instead characterizes them as "business transactions." We cannot agree.

Each of the contracts was drafted on letterhead for Anderson's firm. Throughout the time when these contracts were entered into, Anderson referred to Schwickerath as his client, telling her at one point in an email about the Blade Pros deal that the "way I'm protecting you *(my client)* is I'm guaranteeing repayment through my apartments." (Emphasis added.) Just above the parties' signature lines, four of the contracts stated: "Kara understands that Patrick R. Anderson is an attorney, and that he has an interest in Iowa Property Hold LLC." Schwickerath testified that she thought this meant Anderson was acting as her attorney in these transactions. Consistent with that belief, in an email from September 2018 when she was getting near the end of the money she had available to lend Anderson, Schwickerath said: "Sorry to keep bothering you but I trust you as my attorney to tell me if I'm making a mistake." With these facts, we find no merit in Anderson's argument that he was not acting as Schwickerath's legal counsel when they entered into the contracts, and we conclude substantial evidence supports the court's finding that he committed legal malpractice.

### D. Compensatory Damages

Anderson claims compensatory damages must be recalculated because Schwickerath failed to mitigate her damages. Schwickerath responds that error was not preserved on this issue because the district court did not address that defense. Anderson did raise the issue in his "statement of primary issues for trial" and again in a motion for new trial. But before the court could rule on the new trial

motion, Anderson filed a notice of appeal. The court accordingly entered an order stating it no longer had jurisdiction to rule on the motion.

Citing *Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012), Anderson nevertheless argues error was preserved because the "court's ruling 'indicates that the court considered the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse.'" We disagree. This is not a situation where a ruling "contains incomplete findings or conclusions," but instead one where the issue was simply "'not considered by' the district court and thus error was not preserved." *Lamasters*, 821 N.W.2d at 864 (citation omitted).

### E.     Punitive Damages

Anderson next asserts that because "[t]his is a contract case," punitive damages are not permitted. We reject this argument given our findings on the fraud, misrepresentation, and malpractice claims. *See Larew v. Hope Law Firm, P.L.C.*, 977 N.W.2d 47, 63 (Iowa 2022) ("Punitive damages are generally not available in a breach of contract action unless a party can show malice, fraud, or other illegal actions." (citation omitted)); *see also Wilson v. Vanden Berg*, 687 N.W.2d 575, 586–87 (Iowa 2004) (affirming an award of punitive damages against an attorney who failed to disclose "his conflicted representation").

This leaves the question of whether the damages were excessive. Anderson argues the extent and nature of his conduct wasn't sufficiently outrageous to justify an award of $200,000.00 in punitive damages, again insisting this was simply a breach-of-contract case. This argument overlooks the fraud Anderson committed in his role as an attorney and advisor to Schwickerath over a course of years, which makes his conduct particularly egregious and deserving of

punitive damages. *See, e.g.*, *Hoeppner v. Holladay*, No. 06-1288, 2007 WL 2963662, at *4 (Iowa Ct. App. Oct. 12, 2007) (finding the defendant's "conduct, considering their relationship, was outrageous and designed to deceive. This type of nefarious conduct must be deterred"); *see also Wolf*, 690 N.W.2d at 894 (considering the degree of reprehensibility of the defendant's misconduct).

Anderson also argues that he cannot pay $200,000.00 on top of the $755,371.06 in compensatory damages given his poor financial condition. *See Wilson v. IBP, Inc.*, 558 N.W.2d 132, 148 (Iowa 1996). But while Schwickerath was having to "max[] out" her credit cards and borrow $300,000.00 "to cover court costs and . . . living expenses," Anderson was still taking cruises with his wife at a cost of more than $22,000.00 in 2020 alone. So we find no merit in this complaint.

Nor do we find any merit in Anderson's complaint that the award is "four times greater" than the $50,000.00 Schwickerath requested at trial. Although Schwickerath at first asked for just $50,000.00, she then testified:

> I don't think $50,000 is enough because after going through all this stuff and seeing where my money did go and where it didn't go and all the trips and the jewelry and the payments they made to the racquetball club, they continued their life; and I have literally fallen apart over this, and I'll never get back these last three years of my life, but they lived them up to their fullest.

Given Anderson's conduct, and the need to deter future misconduct, we see no reason to reduce the punitive damage award. *See Tullis v. Merrill*, 584 N.W.2d 236, 241 (Iowa 1998) (upholding punitive damage award because sum awarded would "deter future misconduct and is not so out of proportion to the actual damages as to shock the conscience").

### F.    Attorney Fees

Anderson finally argues that his conduct did not warrant an award of common law attorney fees.  *See Williams v. Van Sickel*, 659 N.W.2d 572, 579 (Iowa 2003) (noting a party can recover common law attorney fees when the party can prove "the culpability of the [opposing party's] conduct exceeds the willful and wanton disregard for the rights of another standard required to prove punitive damages").  Though not raised by either party, we find that we lack jurisdiction to address this claim.  *See Crowell v. State Pub. Def.*, 845 N.W.2d 676, 681 (Iowa 2014) ("[A]n appellate court has responsibility *sua sponte* to police its own jurisdiction.").

Although the district court found Anderson's bad faith merited an award of attorney fees in its September 2021 ruling, the court directed "Schwickerath's counsel to prepare and submit an application for attorney fees and costs." Anderson filed his notice of appeal on October 11, 2021, before the court held a hearing on the amount of fees that should be awarded.  That determination was not made until two weeks later.  Anderson did not separately appeal that ruling. *See* Iowa R. App. P. 6.103(2) ("A final order or judgment on an application for attorney fees entered after the final order or judgment in the underlying action is separately appealable.").

"Although the filing of a notice of appeal generally deprives the district court of jurisdiction, the court 'retains jurisdiction to proceed as to issues collateral to and not affecting the subject matter of the appeal.'" *Iowa State Bank & Tr. Co. v. Michel*, 683 N.W.2d 95, 110 (Iowa 2004) (citation omitted).  Attorney fees are such a collateral matter.  *Id.*  Because that issue was decided after Anderson appealed

the court's ruling on the merits of the lawsuit, he needed to separately appeal the award of attorney fees to bring that matter before us for review. *Id.* Since he did not, "we may not consider the district court's attorney fee award on appeal." *Id.*

### G. Appellate Attorney Fees

This leaves us with Schwickerath's request for an award of appellate attorney fees. We find such an award to be appropriate considering Anderson's conduct, which is antithetical to the very nature of our profession, and his continued denials of wrongdoing on appeal. *See Van Sickel*, 659 N.W.2d at 581 (awarding common law appellate attorney fees where appellant continued to insist on appeal that she did not engage in fraud, "causing the [appellees] to once again defend against this claim"); *see also Olson v. Elsbernd*, No. 10-0236, 2010 WL 5023241, at *6 (Iowa Ct. App. Dec. 8, 2010) (finding appellee was "entitled to appellate attorney fees because she had to defend against [appellant's] continued attempt to excuse her oppressive actions on appeal"). Schwickerath's attorney filed an affidavit and itemization seeking $13,742.05 in appellate attorney fees. We find that amount to be reasonable and award Schwickerath those fees.

## IV. Conclusion

We find substantial evidence supports the district court's ruling on fraud, negligent misrepresentation, and legal malpractice. Anderson's challenge to the court's award of compensatory damages was not preserved. We affirm the award of punitive damages and conclude we lack jurisdiction to address Anderson's challenge to the court's award of trial attorney fees. Schwickerath's request for appellate attorney fees in the amount of $13,742.05 is granted.

**AFFIRMED.**